HATER et al., Appellants,

v.

GRADISON DIVISION OF McDONALD AND COMPANY
SECURITIES, INC. et al., Appellees.

[Cite as *Hater v. Gradison Div. of McDonald & Co.
Securities, Inc.* (1995), 101 Ohio App.3d 99.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–930629.

Decided Jan. 31, 1995.

*White, Getgey & Meyer Co., L.P.A., David P. Kamp* and *David I. Thompson,* for appellants.

*Frost & Jacobs* and *Michael F. Haverkamp,* for appellee Gradison Division of McDonald & Company Securities, Inc.

*Bieser, Greer & Landis, David C. Greer* and *Konrad Kircher,* for appellees Benchmark Equities, Inc., Benchmark Investments, Inc., Benchmark Communities, Inc., and Daniel P. Riedel.

*Ernst & Young, Michael S. Poulos* and *Gerri L. Kornblut; Kathryn A. Oberly* and *Mary Ellen Duffy,* for appellee Ernst & Young.

*Graydon, Head & Ritchey, John J. Kropp* and *R.K. Wellington II,* for appellee Louis W. Meyer V.

*Schwartz, Manes & Ruby* and *William B. Singer,* for appellee Larry Kohn.

*Kohnen & Patton* and *K. Roger Schoeni,* for appellee Anthony F. Mollica & Associates.

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Hamilton County Court of Common Pleas, the transcript of the proceedings, briefs and arguments of counsel.

This is an appeal from the trial court's order granting summary judgment to the defendants-appellees in an action arising out of the financial collapse of a limited partnership that had been formed for the purpose of acquiring and operating an eighty-six-unit apartment complex. The plaintiffs-appellants (collectively, "the investors") were limited partners. Their action against the defendants-appellees was premised upon their claims that the financial condition of the limited partnership had been negligently and fraudulently misrepresented to them, that the general partner, Benchmark Equities, Inc. ("Benchmark"), breached the partnership agreement in several respects, most notably its obligation to capitalize the partnership adequately, and that Benchmark had charged the partnership excessive fees and commissions while allowing its affiliates to borrow partnership money in contravention of the partnership agreement.

On appeal, the investors present seven assignments of error challenging the trial court's decision to grant the defendants-appellees summary judgment. For the reasons that follow, we find none of these assignments to be well taken and thus affirm the trial court.

## I. Factual Background

The investors invested as limited partners in WoodRidge II Associates Limited Partnership ("WoodRidge II"). The purpose of WoodRidge II was to acquire and operate an apartment/townhouse project in Columbus, Ohio, which was to be purchased from a Benchmark affiliate, Benchmark Homes, Inc.

The initial phases of WoodRidge II were structured as follows. The apartment/townhouse units were to be purchased for $3,225,000. Additional fees and expenses were to be paid and a reserve of $45,000 was to be established, creating an initial capital requirement of $3,475,000. To obtain this amount, WoodRidge II was to obtain a first mortgage loan in the amount of $1,800,000, a second mortgage loan from a Benchmark affiliate for $100,000, and a capital contribution of $75,000 from Benchmark. The balance, $1,500,000, was to be obtained from the sale of limited partnership units.

According to the investors, the partnership offering had several safeguards upon which they relied to make sure that the partnership was adequately capitalized. Until fifty percent of the limited partnership units had been subscribed for, the subscriptions were to be placed in escrow, to be returned in the event that the fifty-percent goal was not reached. In the event that more than

fifty percent but fewer than one hundred percent of the units had been subscribed for, Benchmark was to subscribe for the remaining units. According to the investors, under no circumstances was the partnership to proceed with the project with anything less than the full capitalization.

The fifty-percent subscription goal was in fact reached. However, following the transfer of the property and the closing of the offering in September 1989, fewer than one hundred percent of the units had been purchased. The investors alleged in their complaint that Benchmark reneged on its obligation to purchase the unsold units, thus causing a capital shortfall of approximately $300,000. The reason for the failure of Benchmark to live up to its obligation, according to the investors, was that it had cash assets of only $5,000, with its only other assets consisting of overvalued notes receivable from other Benchmark affiliates.

The investors alleged further that Benchmark breached its fiduciary duty to the partnership in 1989 and 1990 by "siphoning off $105,000 out of the partnership account as a short-term loan."

The investors also alleged that the price paid by the partnership for the real property was substantially in excess of the market value appraisal, which was itself inflated. According to the investors, Benchmark misrepresented both the appraised value and the mortgage amount of the property. With regard to the latter, the investors alleged that financial statements of the partnership, audited by Ernst & Young, incorrectly indicated that the first mortgage on the property was only $1.8 million. According to the investors, Benchmark and its affiliates had agreed to divert $550,000 from the partnership that had been earmarked to pay down the first mortgage. Further, the investors contended that language in the offering circular implied that the first mortgage, at the time of the offering, was held by a Benchmark affiliate when in fact it was held by BancOhio. When one of the Benchmark affiliates stopped making interest payments, BancOhio foreclosed in November of 1992, thus wiping out the investment of the plaintiffs-appellants.

## II.  The Complaint

The investors brought this action against nineteen named defendants. The largest group of defendants is identified in the complaint as "broker-dealers" or "investment dealers who recommended this investment to their customers." A second group of defendants consists of Benchmark, its affiliates, and Daniel P. Reidel, president of Benchmark. Finally, the investors named as defendants Anthony F. Mollica & Associates, a professional appraiser, and Ernst & Young, the outside audit firm for both the partnership and Benchmark.

The complaint encompasses sixteen different causes of action. For purposes of analysis these claims can be broken down into four categories:  (1) negligence, (2)

breach of contract, (3) fraud, and (4) violations of the securities laws of Ohio, Pennsylvania, and Michigan.

*The Negligence Claims:* Count I alleged a claim of negligent misrepresentation against all defendants for failing to ascertain whether information in the offering circular was correct. Count V alleged accountant negligence against Ernst & Young for negligently performing auditing and accounting services for the partnership. Count VI alleged appraiser negligence against Anthony Mollica & Associates for negligently performing a number of property appraisals in connection with the acquisition, development, and financing of the WoodRidge II project. Count VII alleged broker-dealer negligence against all broker-dealer defendants for negligently failing to determine whether the partnership was a suitable investment for each of the investors.

*Breach-of-Contract Claims:* Count II alleged that the investors were third-party beneficiaries of the brokerage agreement between Benchmark and the broker-dealers, and that the broker-dealers breached a contractual duty to the investors by failing to determine the suitability of the project for each investor and failing to inform each investor of all the pertinent facts relating to the liquidity and marketability of the partnership units. Count III alleged that Benchmark violated the partnership agreement by failing to provide funds for the cash flow guarantee, subscribe for unsold units, establish a working capital reserve of $45,000, and protect the partnership assets from unauthorized loans to Benchmark affiliates.

*Fraud Claims:* Count IV alleged that Benchmark and Ernst & Young fraudulently misrepresented and concealed the financial condition of the partnership until foreclosure occurred. Count VIII alleged that the broker-dealers fraudulently misrepresented the financial condition of the partnership in the offering circular and other materials.

*Statutory Claims:* Counts IX through XVI alleged statutory violations of the securities laws of Ohio, Michigan, and Pennsylvania.

### III. Decision of the Trial Court

As noted, the trial court granted summary judgment to the defendants-appellees as to all of the above counts.

*Negligence Claims:* With regard to these claims, the trial court found the four-year statute of limitations contained in R.C. 2305.09 to be applicable. Moreover, the trial court relied upon the Ohio Supreme Court's decision in *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206, to reject application of the discovery rule to toll the statute of limitations. As to those negligence claims which arose in connection with the offering circular, the trial court found that these claims were time-barred, since the circular was issued on September 1,

1988, and the suit was not filed until February 3, 1993. Finding no allegation that defendants Gradison, Moyer, Kohn, or Mollica performed or failed to perform any actions subsequent to the issuance of the circular, the court granted these defendants summary judgment based on the statute of limitations.

Significantly, the trial court did not specifically discuss the negligence claim against Ernst & Young contained in Count V. As noted, this claim asserted that Ernst & Young negligently performed accounting and auditing services for the partnership after the offering circular had been issued. Without discussing this claim, however, or specifically determining when the wrong occurred which would trigger the running of the four-year statute of limitations, the trial court included this count in its grant of summary judgment.

*Contract Claims:* With respect to the investors' claim that they were third-party beneficiaries of the Participating Dealer Agreement entered into between Benchmark and the broker-dealers, the trial court, after noting that there must be intent to benefit a third party in order to create in that party an enforceable contract right, expressly considered (1) the Participating Dealer Agreement and (2) the affidavit of R.J. Conley, president of one of the broker-dealer defendants, in which Conley stated that the purpose of the agreement was not to benefit the investors. Finding no evidence to suggest otherwise, the trial court found all the broker-dealer defendants entitled to summary judgment on the contract claims against them.[1]

With respect to the contract claims against Benchmark for alleged violations of the partnership agreement, the trial court, relying on this court's decision in *Katz v. Genninger* (Jan. 31, 1985), Hamilton App. No. C–840219, unreported, 1985 WL 9294, found that these claims arose from the sales of securities and were hence governed by the statute of limitations contained in R.C. 1707.43. This section provides that:

"No action for the recovery of the purchase price as provided for in this section, and no other action for any other recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707. of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than four years from the date of such sale or contract for sale, whichever is the shorter period."

---

1. The trial court also noted that there was language in Count II which indicated a possible contract claim on a similar theory that the plaintiffs-appellants were third-party beneficiaries of the contract between Benchmark and Ernst & Young. Finding no evidence to support this theory, the trial court granted summary judgment on this claim as well.

The trial court found that after receipt of a November 6, 1989 letter from Daniel P. Reidel, president of Benchmark, each investor either knew, or should have known, of the facts giving rise to their contract claims, thus implicitly finding the two-year statute of limitations applicable and sufficient to time-bar these claims.

*Fraud Claims:* As in its resolution of the contract claims in Count III, the trial court, relying on *Katz, supra,* found that the investors' fraud claims arose from the sale of securities and were thus time-barred under R.C. 1707.43.

*The Securities Claims:* In accordance with its determination with respect to the contract claim in Count III and the fraud claims, the trial court found the investors' securities claims under Ohio law time-barred under R.C. 1707.43.[2]

## IV. Assignment of Error No. 1

In their first assignment of error the investors allege that the trial court "improperly resolved factual disputes in considering the Motions for Summary Judgment." The issue presented is stated as follows:

"In a case involving matters of motive, intent and other key factual issues, it is error to grant summary judgment when a movant is unable to offer any factual support for his contention that there exist no genuine factual disputes on material issues."

The investors next note that "[i]t perhaps states the obvious" that the parties' interpretation of events is in dispute and next offer "examples [to] illustrate the problem."

Initially we note that the investors have appealed from the trial court's order granting summary judgment on all sixteen counts of their complaint. As a matter of basic appellate procedure, it is the investors' burden to identify a specific error with respect to each count. Thus, in the context of the investors' first assignment of error, it is their burden to identify, with respect to each count, a triable issue of material fact. The investors' use of illustrative examples to form their appellate argument does not impose a duty upon this court to extrapolate from those examples and raise arguments not otherwise made. In other words, we will address the examples given, but no more.

The investors identify three instances in which they maintain that the trial court improperly determined issues of fact. Those instances involve the contract claims, the November 6, 1989 letter, and the time of occurrence of a legally cognizable injury.

---

**2.** At oral argument in this case, counsel for the investors made clear that they were not prosecuting an appeal with respect to the alleged violations of the securities laws of Michigan and Pennsylvania.

■ *The Contract Claims.* Initially we note that the investors had the burden at trial to establish that they were the intended third-party beneficiaries of the contract between the broker-dealers and Benchmark. Moreover, to make a point that bears emphasis with respect to all of the investors' claims, the defendants-appellees' motions for summary judgment imposed a burden on the investors to produce evidence on all issues for which they bore the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, citing *Celotex v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. Thus, their argument that the trial court "improperly determined that the defendants had met their burden of proving intent" must fail. Without some probative evidence that the contracting parties intended to make the investors third-party beneficiaries, the trial court properly granted summary judgment in the defendants-appellees' favor.

■ *The Reidel Letter.* The investors argue that the trial court ignored the affidavit of Robert E. Hater, averring that he had no awareness of the risk of loss of his investment until the property was foreclosed upon, and instead improperly interpreted the November 6 letter as barring the claims of the investors. The investors contend that the trial court "chose to ignore this unrebutted testimony that Mr. Hater, *and presumably other investors,* had no idea of the woeful state of the partnership's financial condition." (Emphasis added.)

In rejecting this argument we first note that the only affidavit on this point was from investor Hater; evidence of what the other investors knew about the financial condition of the partnership was not before the trial court and is not part of the record before this court. Moreover, even were there similar affidavits from all the investors, they would not have rendered the trial court's grant of summary judgment improper. This is so because R.C. 1707.43 provides a two-year statute of limitations from the date that the investors either knew "or had reason to know" of the facts underlying their complaint. The trial court found that the Reidel letter satisfied the second prong. We hold that the Hater affidavit did not create any issue of *material* fact because the trial court properly held, *as a matter of law,* that the contents of the letter—which were not in dispute—put all the investors on notice of their need to pursue their remedies. This is especially so when the letter itself, notifying each investor of Benchmark's intention to proceed without subscribing for the additional units, clearly stated that this action would be deemed consented to by each investor unless objection was received by November 21, 1989. Each investor received this letter; none objected to the action. The trial court correctly determined that the Reidel letter was sufficient in law to appraise investors of certain matters involving the financial health of the partnership, and this determination did not require fact-finding.

■ *The Date of Injury.* The investors' entire argument on this issue is phrased as follows:

"Further, the trial court implicitly determined when the appellants suffered their injuries. This is likewise a factual issue which the court should not have decided at this stage."

Although this is the extent of the investors' argument here, by referring to their third assignment of error, where this issue is argued with more elaboration, we glean that their point of contention is that they did not suffer injury until the WoodRidge II property was foreclosed upon, and hence it was not until this injury, giving rise to a cause of action, that the statute of limitations should have commenced running. Whether the foreclosure in this case constituted the actionable injury, however, triggering the running of the statute of limitations, is a legal, not a factual issue. Thus, we hold that the trial court did not "improperly resolve factual disputes" in granting the defendant-appellees summary judgment. Furthermore, as is discussed more fully below, in our discussion of the investors' fourth assignment of error, it is not the date of the injury but the date that the allegedly negligent act was committed that triggers the running of the statute of limitations in the types of negligence claims with which we are here concerned.

The investors' first assignment of error is, therefore, overruled.

## V. Assignment of Error No. 2

■ In their second assignment of error, the investors assert that "[t]he trial court erred in considering motions for summary judgment at such an early stage of this litigation." This assignment of error is overruled. As the investors concede in their brief, the parties agreed to postpone discovery until the outcome of the motions for summary judgment and dismissal. Moreover, as the defendants-appellees assert, the investors have not shown that any amount of further discovery could have changed the undisputed facts upon which the trial court relied.

## VI. Assignment of Error No. 4

The investors' third and fourth assignments of error both concern the running of the statute of limitations with respect to their negligence claims. Because we find the fourth assignment of error to be concerned with issues of more general application, we will begin with it, and then address the more specific arguments addressed in the third assignment.

In their fourth assignment of error, the investors allege that the trial court erred in its analysis of when the negligence statute of limitations commenced to run. The crux of their argument is that the statute of limitations could not have commenced running until they had suffered an actionable injury, and that event

did not occur until 1992 when the WoodRidge II apartment complex was foreclosed upon.

As noted previously, the investors alleged several different types of professional negligence in their complaint: negligent misrepresentation against all defendants, accountant negligence against Ernst & Young, appraiser negligence against Mollica & Associates, and broker-dealer negligence against the broker-dealer defendants. Under this assignment of error they do not distinguish among these claims, so it is assumed that the assignment of error applies to all.

With specific regard to accountant negligence, in *Investors REIT One, supra,* 46 Ohio St.3d 176, 546 N.E.2d 206, the court held in the syllabus:

"1. Claims of accountant negligence are governed by the four-year statute of limitations for general negligence claims found in R.C. 2305.09(D), not by the two-year period for bodily injury or injury to personal property set forth in R.C. 2305.10, or by the one-year limitations period for professional malpractice claims in R.C. 2305.11(A).

"2a. The discovery rule is not available to claims of professional negligence brought against accountants."

■ In arriving at the law expressed in its syllabus, the court in *REIT One* did not limit its discussion of the inapplicability of the discovery rule to actions for accountant negligence. We believe the logic of *REIT One* can reasonably be extended to the claims of professional negligence brought against the broker-dealers and appraisers in this case. See, *e.g.*, *Avery B. Klein & Co. v. Joslyn* (Apr. 8, 1993), Cuyahoga App. No. 61841, unreported, 1993 WL 106948 (holding of *REIT One* not limited to claims of accountant negligence, but applies generally to claims for professional negligence controlled by R.C. 2305.09, including negligent investment advice). Furthermore, in rejecting the application of the discovery rule in the context of R.C. 2305.09(D), the court in *REIT One* held clearly that "[t]he four-year statute of limitations governing such claims in accountant negligence commenced to run when the allegedly negligent act was *committed* * * *." (Emphasis added.) *REIT One, supra,* 46 Ohio St.3d at 182, 546 N.E.2d at 212.

The investors, however, would distinguish between the "discovery rule" and a "delayed damage" theory. In other words, the investors contend that they need not rely upon the discovery rule as such because, under classic tort law dating back to *Palsgraf v. Long Island RR. Co.* (1928), 248 N.Y. 339, 162 N.E. 99 (Cardozo, C.J.) (" 'Proof of negligence in the air, so to speak, will not do.' Pollock, Torts (11th Ed.) p. 455") and until WoodRidge II collapsed in foreclosure, no actionable injury had occurred to set in motion the running of the statute of limitations.

In responding to this argument, we note first that a similar distinction between the discovery rule and the delayed-damage theory was rejected as a distinction without a difference by the court in *Reidel v. Houser* (1992), 79 Ohio App.3d 546, 607 N.E.2d 894. In *Reidel*, the appellant argued, as the investors do here, that notwithstanding the holding of *REIT One*, the statute of limitations should not have commenced to run on a claim that an accountant's preparation of tax returns was negligent until the date upon which damages could be attributed to the faulty returns. The *Reidel* court found this argument to be, in effect, the discovery rule in different guise and thus precluded by the holding of *REIT One* that the discovery rule was not applicable to claims of accountant negligence controlled by R.C. 2305.09(D).

Several other Ohio decisions have reached conclusions similar to *Reidel* on similar facts: *Avery B. Klein & Co. v. Joslyn, supra* (cause of action for negligent investment advice accrued when advice was received, *not* when appellant's note was called as a result of allegedly faulty advice); *Philpott v. Ernst & Whinney* (Nov. 25, 1992), Cuyahoga App. No. 61203, unreported, 1992 WL 357250 (appellant's argument that statute of limitations on claim for accountant malpractice did not commence until IRS audit had assessed deficiency rejected upon the basis of *REIT One*); *Bagley v. Hall* (June 11, 1992), Franklin App. No. 92AP–18, unreported, 1992 WL 132454 (appellants' argument that their cause of action for accountant negligence did not accrue at the time of the misrepresentation because they suffered no damage until the lapse of time precluded recovery of overpayment of taxes rejected on the basis of *REIT One* ); *Lord v. Ernst & Whinney* (June 3, 1992), Summit App. No. 15361, unreported, 1992 WL 126125 (appellant's argument that claim for accountant negligence for improperly pre-pared gift tax return did not accrue until IRS assessed gift tax liability rejected, delayed-damage approach determined not to "survive as a viable legal concept" in light of the holding in *REIT One*). Furthermore, one law review writer has noted that "most states provide that the statute of limitations for an accountant's negligence to a third party begins to run on the date the party received the report." Note, Who Should Pay When Federally Funded Insured Pension Funds Go Broke?: A Strategy for Recovery from the Wrongdoers (1990), 65 Notre Dame L.Rev. 308, 363.

The controlling law on this issue is, we believe, set forth in *REIT One*. By holding that the statute of limitations began to run "when the allegedly negligent act was committed," the court in *REIT One*, in our view, meant exactly that: the date upon which the tortfeasor committed the tort, in other words, when the act or omission constituting the alleged professional malpractice occurred. Regard-less of its validity or support in the common law of torts, the delayed-damage

theory cannot, we believe, be used to circumvent the clear holding of *REIT One* by resurrecting the discovery rule in a different analytical guise.[3]

The investors' fourth assignment of error is overruled.

## VII. Assignment of Error No. 3

■ In their third assignment of error, the investors assert that the trial court "erred in holding that the negligence statute of limitations, R.C. 2305.09, barred appellants' claim for accountant negligence which occurred within the limitations period." Under this assignment, they challenge specifically the trial court's findings with respect to the claims of accountant negligence contained in Count V, arguing that the trial court failed to see that many of these claims involved audits performed in 1990, 1991, and the 1992 fiscal year, thus bringing them within the four-year statute of limitations, even under the "occurrence rule" as opposed to the discovery rule.

We have in our discussion of the fourth assignment of error already discussed the holding of *REIT One* that the four-year statute of limitations for accountant negligence under R.C. 2305.09(D) begins to run "when the allegedly negligent act was committed." Having essentially reversed roles with respect to the positions they took in the fourth assignment of error, the investors would have this holding now applied literally, so that the statute of limitations on these claims commenced upon the issue of each audit. On the other hand, Ernst & Young, relying heavily on the court's analysis in *Helman v. Murry's Steaks, Inc.* (D.Del.1990), 742 F.Supp. 860, argues that audits rendered subsequent to the sale of a security "lack the requisite degree of materiality" to support a claim for accountant negligence because the investors had already made the decision to invest. In other words, Ernst & Young now seeks to shift the focus to the question of injury, arguing that there was none with respect to these audits. In this regard, it points out that the investors have not demonstrated what they would have done differently had they been aware of the allegedly negligent misrepresentations contained in these audits.

It bears emphasis that we are concerned under this assignment of error solely with the issue of the statute of limitations, and not the sufficiency of the

---

3. As noted by Justice Sweeney in his partial dissent in *REIT One*, the effect of its holding is to preclude redress even to those who are injured by accountant negligence but were unable through due diligence to promptly uncover the wrong done to them. *REIT One*, 46 Ohio St.3d at 183, 546 N.E.2d at 212–213 (Sweeney, J., concurring in part and dissenting in part). Although its effect may seem harsh and arguably out of step with the discovery rule adopted in other areas of tort law, we note that the holding of *REIT One* is explicit and that it has not been subsequently modified or limited by the Ohio Supreme Court.

pleadings.[4] With that in mind, we nonetheless find that the trial court did not err in holding these claims time-barred because we hold that the issuance of subsequent audits, which repeat or perpetuate the alleged misrepresentations of earlier audits, do not constitute separate acts of negligence, with different limitations periods. Rather, the time "when the allegedly negligent act was committed," for the purposes of applying *REIT One* to the accountant negligence claims, is the time when the original misrepresentations were made.

The investors' third assignment of error is, therefore, overruled.

### VIII. Assignment of Error No. 5

■ In their fifth assignment of error, the investors contend that "the trial court erred in applying the statute of limitations for securities fraud claims (R.C. 1707.43) to allegations of fraud which occurred long after the securities were sold." Although the assignment of error refers broadly to "allegations of fraud," in their argument under this assignment the investors address only the allegations of fraud contained in Count IV of their complaint.

As noted previously, the trial court, relying on this court's decision in *Katz, supra,* found that the fraud claims in Count IV of the complaint were predicated on a sale of securities and thus subject to the statute of limitations contained in R.C. 1707.43. The investors contend that the allegedly fraudulent acts delineated in Count IV of their complaint occurred long after the sale of the partnership interests and have "no relation whatsoever to the *sale* of WoodRidge II securities." According to the investors, their fraud claims were brought by them as "*owners* of the securities, not as *purchasers.*"

The allegations of fraud contained in Count IV are as follows: that the Benchmark defendants and Ernst & Young (1) concealed from the investors the actual value of the encumbrances on the property while issuing audited financial statements and other financial reports stating an incorrect value, (2) concealed from the investors that a loan of partnership assets to a Benchmark affiliate violated the partnership agreement, (3) concealed from the investors that the assets of Benchmark consisted of notes due from affiliates and were worth substantially less than their stated value, and (4) concealed from the investors the existence of a fair market value appraisal stating that the WoodRidge II property was worth less than the price paid by the limited partnership.

---

4. The defendants-appellees assail the investors' complaint as lacking specificity with respect to the time and place of alleged misrepresentations in audited financial statements, and also with respect to the fraud claims in general. Although the issues with which we are here concerned do not necessarily rest upon the sufficiency of the pleadings, we find it appropriate to express our agreement that the complaint lacks the detail necessary to particularize many of the allegations, and that the fraud claims are, for the most part, not stated with the specificity required by Civ.R. 9(B).

We concur with the trial court that these claims arise essentially from, and are thus predicated upon, the sale of securities and are therefore subject to the period of limitations contained in R.C. 1707.43. *Katz, supra.* R.C. 1707.43 provides:

"No action for the recovery of the purchase price as provided for in this section, and *no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707. of the Revised Code,* shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than four years from the date of such sale or contract for sale, whichever is the shorter period." (Emphasis added.)

In *Katz,* we recognized that although, in general, claims based on common-law fraud are governed by the four-year period set forth in R.C. 2305.09, the General Assembly had carved out an exception applicable to allegations of fraud which are necessarily predicated upon a sale made in violation of R.C. 1707.01 *et seq.* Here, despite counsel's best efforts to portray them as something else, the allegations of fraud are inextricably interwoven with the sale of the partnership units, and thus we hold that the trial court did not err when it found that they were controlled by the limitations period contained in R.C. 1707.43.

## IX. Assignment of Error No. 6

In their sixth assignment of error, the investors argue that "[t]he trial court erred in its application of 1707.43 to the facts set forth in appellants['] securities law claims." Under this assignment, they concede that Counts VIII through XIII of their complaint relate directly to the offering and sale of the securities; however, they argue that the trial court erred in determining when the sales of the securities occurred for the purpose of triggering the running of the statute of limitations. Specifically, they assert that the trial court erred by finding that the sales of the securities occurred at the time the subscription agreements were executed as opposed to when the certificates were issued or, alternatively, when the Certificate of Limited Partnership was amended to reflect the admission of the investors.[5]

R.C. 1707.43, as noted, requires plaintiffs to bring an action either two years from the time they knew, or had reason to know, of the facts underlying their complaint, or four years "from the date of such sale or contract for sale, whichever is the shorter period." As discussed previously, the trial court found that the November 6, 1989 Reidel letter triggered the running of the two-year

---

5. The purchasers in WoodRidge II did not become limited partners until October 1989, and did not receive their partnership securities until November 1989.

statute of limitations based upon its conclusion that the information in the letter was sufficient to give the investors reason to know of the facts underlying their complaint. We overruled the investors' first assignment of error in which they challenged this conclusion. Hence, the trial court's holding that the two-year statute of limitations applies remains intact. This being so, any discussion of the four-year statute of limitations is rendered moot.

The investors' sixth assignment of error is, therefore, overruled.

### X. Assignment of Error No. 7

In their seventh and final assignment of error, the investors assert that the trial court erred by applying the wrong statute of limitations to the breach-of-contract claims set forth in Count III involving alleged breaches of the partnership agreement. The investors contend that these claims should be controlled by the 15–year statute of limitations for breach of written contract set forth in R.C. 2305.06.

The specific alleged breaches of contract to which the investors refer are that the Benchmark defendants (1) failed to provide funds to the limited partnership by failing to subscribe for the unsold partnership units, (2) failed to establish the working capital reserve of $45,000, and (3) allowed a Benchmark affiliate to improperly borrow partnership funds.

The trial court, as noted, found that these claims arose from the sale of securities and were thus subject to the statute of limitations contained in R.C. 1707.43. Based upon the same reasoning we set forth under the investors' fifth assignment of error, we hold that the trial court did not err by holding that these claims were predicated upon a sale in violation of R.C. 1707.01 *et seq.*, *Katz*, *supra*, and thus controlled by the two-year statute of limitations contained in R.C. 1707.43.

### XI. Conclusion

Based upon the foregoing, the judgment of the trial court is affirmed.

*Judgment affirmed.*

SHANNON, P.J., GORMAN and M.B. BETTMAN, JJ., concur.