Harold D. BAKER, et al., Plaintiffs,

v.

Herbert J. PFEIFER, et al., Defendants.

No. C2–94–099.

United States District Court,
S.D. Ohio,
Eastern Division.

Sept. 20, 1996.

John Hamrick Burtch, Baker & Hostetler, Columbus, OH, for Harold D. Baker, M. Curtiss McKee, Emile C. Ott.

Laurence Edward Sturtz, Carlile, Patchen & Murphy, Columbus, OH, for Herbert J. Pfeifer, Tiger Oil, Inc.

Thomas Michael Tyack, Tyack & Blackmore Co. L.P.A., Columbus, OH, for Henrietta Pfeifer.

Thomas Michael Tyack, Tyack & Blackmore Co., L.P.A., Columbus, OH, for Mid–Ohio Historical Museum Inc., Gerald Pfeifer.

Thomas Michael Tyack, Tyack & Blackmore Co., L.P.A., Columbus, OH, John Henry Pettorini, Lancaster, OH, for J & P Oil Corp.

### OPINION AND ORDER

DLOTT, District Judge.

This matter is before the Court on Defendants' Motions for Summary Judgment (Doc. Nos. 82, 83, and 84). The parties appeared for oral argument on May 9, 1996. Having considered the arguments and the law in this case, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motions.

### I. BACKGROUND

Plaintiffs Harold D. Baker, Emile C. Ott and M. Curtiss McKee are Mississippi residents who invested in oil and gas wells in Ohio. The Complaint names the following

individuals and entities as defendants: Tiger Oil, Inc., J & P Oil, J & P Salvage, Mid–Ohio Historical Museum, Herbert Pfeifer, Gerald Pfeifer and Henrietta Pfeifer. Tiger Oil, Inc. ("Tiger"), is an Ohio corporation engaged in the development and operation of oil and gas wells. First Amended Complaint ("Compl.") at ¶ 7. J & P Oil, also doing business as J & P Salvage and J & P Salvage, Inc., is an Ohio corporation also involved in the oil and gas industry. Compl. at ¶ 9. (These entities are referred to collectively in this opinion as "J & P"). Mid–Ohio Historical Museum ("Mid–Ohio") is an Ohio not-for-profit corporation run by Henrietta Pfeifer that operates a doll and toy museum. Compl. at ¶ 8. Defendant Herbert Pfeifer ("Herbert") is a director and shareholder of Tiger. Compl. at ¶ 4. Gerald Pfeifer ("Gerald"), Herbert's brother, is President and a shareholder of Tiger. He is also an owner and officer of J & P. Compl. ¶ 6. Henrietta Pfeifer ("Henrietta"), Herbert's wife, is the Treasurer of Tiger and operates Mid–Ohio. Compl. ¶ 5.

During the 1970's and 1980's, Plaintiff Harold Baker entered into a series of oil and gas "Development Agreements" with Tiger. Under these agreements, Baker[1] agreed to fund Tiger's drilling of specific oil and gas wells in Ohio. In exchange, Tiger promised to assign to Baker an undivided, fractional working interest in the revenues from each of the wells. Tiger agreed to operate the wells and arrange for the sale of the oil and gas produced. As compensation, Tiger also received a portion of the wells' revenues. Compl. ¶¶ 14–16.

Plaintiffs now allege that Defendants engaged in several fraudulent schemes in connection with Plaintiffs' investments and participation in the Development Agreements.

*First*, Plaintiffs allege that Tiger engaged in a scheme to understate the amount of gas and oil produced by the wells while, at the same time, overstating the costs associated with operating the wells. This allegedly allowed Defendants to understate profits and reduce revenue payments to Plaintiffs under the Development Agreements. Compl. at ¶ 16.

*Second*, Plaintiffs allege that Tiger intentionally caused the wells to underproduce in order to induce Plaintiffs to reassign their interests in the wells. Specifically, Plaintiffs contend that Herbert and Tiger falsely stated that certain wells had reached their economic limits and could no longer be operated profitably. Therefore, Herbert informed them, Tiger was assigning its interests in the wells to Mid–Ohio, the non-profit doll museum. Based on this information, Plaintiffs also decided to assign *their* interests in the wells to Mid–Ohio. Tiger, however, never transferred *its* interests in the wells. Instead, Plaintiffs allege that Tiger continues to operate the wells and that production increased after Plaintiffs parted with their interests in the wells. Compl. at ¶¶ 17–23.

Plaintiffs also claim that Defendants fraudulently induced them to assign their interests in some of the wells to J & P. According to Plaintiffs, Tiger informed them that J & P was in the business of reclaiming and plugging spent natural gas wells. Herbert Pfeifer advised them to assign their interests in the spent wells to J & P rather than paying to plug and shutdown the wells themselves. What Herbert did not say, however, was that Herbert and Gerald owned J & P and that Plaintiffs, therefore, were transferring their interests to Herbert and Gerald. Further, the Complaint alleges that Tiger Oil continues to operate these wells, producing gas revenues for itself. *See* Compl. at ¶¶ 26–27.

Plaintiffs further allege that Tiger failed to file production reports with the State in order to conceal the above misconduct. According to Plaintiffs, these reports would have demonstrated that the wells were in fact still productive and economically viable *after* Plaintiffs assigned their interests to the various Defendants. Compl. at ¶ 28.

*Third*, Plaintiffs allege that Defendants engaged in fraud in connection with two natural gas leases in Washington County: the Stockport Sand & Gravel Lease and the Schott Unit Lease. According to the Plaintiffs, in 1978, Baker entered into a Development Agreement with Tiger, in which he would

---

1. After entering into these agreements, Baker assigned portions of his interests in the projects to other investors, including Plaintiffs Ott and McKee. Compl. ¶ 15.

receive a 75% working interest in the two leases after the first well was drilled. Although the leases cover a total of approximately 150 acres, Tiger only assigned to Baker a 75% interest in an *80* acre parcel. Compl. at ¶¶ 29–30. Further, Plaintiffs contend that Tiger subsequently drilled a second well on the property in violation of the terms of the Development Agreement. Tiger did not inform Plaintiffs of this well, nor has it shared any of the revenues from the well. Compl. at ¶ 31.

*Fourth,* in 1986 Baker paid Tiger $30,000 for working interests in three 40 acre leaseholds with one well to be drilled on each parcel (the "Lowell Area Leases"). Tiger owned an additional 700 acres adjacent to these leaseholds. Baker alleges that Herbert agreed 1) that Tiger would not drill any wells within 2,000 feet of Baker's leaseholds and 2) that Baker would have a right of first refusal to participate equally in any wells developed by Tiger on the 700 acres. Notwithstanding these promises, however, Tiger drilled wells on the 700 acres without offering Plaintiffs the right to participate in the operation of these wells. *See* Compl. at ¶¶ 32–33.

*Fifth* and finally, in 1989 Tiger and Baker (among others) were sued by East Ohio Coal Co. ("East Ohio"). East Ohio claimed that it had a 50% working interest in two wells that Tiger had developed. Tiger had assigned working interests in those wells to Baker. Allegedly in reliance on Tiger's promise to defend his interests and to account for any proceeds from the wells, Baker transferred his interests in the wells to Tiger during the pendency of the litigation. Upon settlement of the litigation, Tiger failed to give Baker his share of the settlement proceeds. Tiger also failed to pay Baker for certain equipment that was attached to the wells. Compl. at ¶ 35.

Plaintiffs assert that they first discovered that Defendants had defrauded them during the summer of 1992. At that time, Tiger was negotiating the sale of several wells to K Petroleum. K Petroleum contacted Baker regarding his apparent interests in some of these wells. This contact apparently caused Plaintiffs to question their dealings with Defendants and to launch an investigation. Compl. at ¶ 36. Plaintiffs commenced this litigation on February 2, 1994, asserting causes of action for, *inter alia*,[2] securities fraud, breach of contract and RICO violations. Defendants have now moved for summary judgment.[3]

## II. ANALYSIS

Summary judgment[4] should be granted only when, based on the pleadings, depositions, affidavits and other evidence, the Court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

---

**2.** The Complaint alleges the following causes of action: 1—Breach of Contract; 2—Breach of Contract; 3—Fraud; 4—Fraud; 5—Breach of Fiduciary Duty; 6—Breach of Contract; 7—Fraud; 8—Breach of Fiduciary Duty; 9—Breach of Contract; 10—Breach of Contract; 11—Fraud; 12—Breach of Fiduciary Duty; 13—Violation of Rule 10b–5; 14—Violation of RICO, 18 U.S.C. § 1962(c); 15—Violation of RICO, 18 U.S.C. § 1962(d); 16—Corrupt Activity in violation of Ohio R.C. § 2923.31; 17—Violation of Ohio R.C. § 2923.34(B).

**3.** Different Defendants have moved for summary judgment on different combinations of claims. Except as expressly stated, the Court assumes

that each Defendant joins in the motions of the other Defendants.

**4.** Plaintiffs argue that Defendants have employed the wrong procedural vehicle in connection with several of the issues in this motion. Specifically, Plaintiffs argue that Defendants should have moved for judgment on the pleadings under Rule 12(c) and not for summary judgment as a matter of law under Rule 56(c). This argument need not detain the Court at this stage. *See* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2713 at 594 ("Of course, a summary judgment motion may be made on the basis of the pleadings alone, and if this is done it is functionally the same as a motion to dismiss for failure to

On those issues for which it shoulders the burden of proof, the moving party must make a showing that is " 'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.' " *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)) (emphasis omitted). For those issues where the moving party will *not* have the burden of proof at trial, the movant must "point[ ] out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party then must make a showing sufficient to establish a genuine dispute of fact with respect to that element. *Id.* This showing must amount to more than pointing once again to the pleadings—the movant " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Thus, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted).

## A. THE THIRTEENTH CLAIM FOR RELIEF—RULE 10b–5.

■ Defendants first argue that Plaintiffs' Thirteenth Claim for Relief, for violations of S.E.C. Rule 10b–5, is time-barred and therefore must be dismissed.

■ Claims for securities fraud pursuant to § 10b of the Securities Exchange Act of 1934 and Rule 10b–5 must be brought within one year of discovery and, in any, case no more than three years after the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). Plaintiffs do not dispute that they discovered the fraud underlying their Rule 10b–5 claim ap-

proximately fourteen months before they commenced this litigation. Accordingly, Plaintiffs' Rule 10b–5 claim is time-barred and Defendants' motion for summary judgment is **GRANTED** as to the Thirteenth Claim for Relief.

## B. THE FOURTEENTH AND FIFTEENTH CLAIMS FOR RELIEF—RICO AND CONSPIRACY TO VIOLATE RICO.

### 1. *The Private Securities Litigation Reform Act of 1995.*

On December 22, 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 (the "Securities Reform Act") which amended numerous portions of the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act"). The legislation, which was "prompted by significant evidence of abuse in private securities lawsuits ... implement[ed] needed procedural protections to discourage frivolous litigation." H.R.Conf.Rep. No. 369, 104th Cong., 1st Sess. 31–32 (1995) [hereinafter "H.R.Conf.Rep."]; *see also In re Prudential Securities Incorporated Limited Partnerships Litigation,* 930 F.Supp. 68, 77 (S.D.N.Y.1996) ("The new law is designed to protect corporations against the filing of frivolous securities actions.") (hereinafter *Prudential Securities* ). Among other things, the Securities Reform Act strengthened pleading requirements for securities fraud claims and significantly altered the rules governing the conduct of private class action litigation.

In addition to redrafting numerous aspects of the 1933 and 1934 Acts, Congress also included § 107, which amended a portion of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.* (The Court will refer to the amendments contained in § 107 as the "RICO Amendments.") The RICO Amendments were an attempt to close what Congress perceived as a loophole in the former version of RICO.[5] Prior to the RICO Amendments, a

state a claim or for a judgment on the pleadings.").

5. The Conference Committee cited the testimony of SEC Chairman Arthur Levitt:

Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both necessary [sic] and unfair

plaintiff could use RICO—with its provisions for treble damages and its longer limitations period—to pursue claims for securities fraud. Section 107, however, amended RICO to remove securities fraud as a permissible predicate act for purposes of establishing a pattern of racketeering activity.[6] Specifically, the Act amends 18 U.S.C. § 1964(c) to state that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962." Section 107 (Pub.L. No. 104–67, 109 Stat. 737, 758 (Dec. 22, 1995)).[7]

■ In light of the RICO Amendments, Defendants argue that Plaintiffs' RICO claims, which allege a pattern of racketeering based on securities fraud, are no longer viable and must be dismissed. That is, Defendants argue that the RICO Amendments should be applied retroactively to all claims pending on December 22, 1995. Plaintiffs concede that, if the RICO Amendments are applied retroactively, their RICO claims must fail because they have only pled predicate acts of securities fraud. Plaintiffs, however, argue that the Court should not apply the RICO Amendments retroactively.

■ It is well-established that, as a general rule, legislation will not be given retrospective application absent a clear expression of Congress' intent that the statute should be so applied. *See e.g., Landgraf v. USI Film Prod.*, 511 U.S. 244, ——, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) ("the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").[8] Defendants, as the parties arguing that the statute should be applied retroactively, bear the burden of demonstrating that Congress expressed such an intent. *Taliaferro v. Stafseth*, 455 F.2d 207, 209 (6th Cir.1972) ("It is incumbent upon the person who argues for retrospective application to show that Congress intended for the Act to be applied in that fashion.").

The first step in determining whether or not a statute should be given retroactive application is to examine the terms of the statute "to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1505. If Congress did not express clearly its intent regarding the prospective or retrospective application of the statute, the court must then resort to certain judicial default rules to determine whether or not the statute should be applied retroactively. *Id.* In particular, "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If the statute would have a retroactive effect, the general presumption against retroactively applies, the court must find that the statute has only prospective application. *Id.* If, however, the new statute confers or ousts jurisdiction, or changes procedural rules, the court need not apply the general presumption in favor of

to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO. H.R.Conf.Rep. at 43; *see also Prudential Securities*, 930 F.Supp. at 77 (Congress included § 107 "[i]n response to Congressional concerns that civil RICO served as a loophole for attorneys to bring stale securities actions....").

6. Under prior law, racketeering activity included "any offense involving ... fraud in the sale of securities ..." as well as "any act which is indictable under any of the following provisions of title 18, United States Code: ... Section 1341 (relating to mail fraud), Section 1343 (relating to wire fraud) ..." 18 U.S.C. § 1961.

7. The legislative history of the Securities Reform Act indicates that Congress intended this language to preclude other offenses such as mail guage to preclude other offenses such as mail

fraud and wire fraud as permissible predicate acts of racketeering "if such offenses are based on conduct that would have been actionable as securities fraud." H.R.Conf.Rep. at 43.

8. *See also Velsicol Chem. Corp. v. Enenco, Inc.*, 9 F.3d 524, 528 (6th Cir.1993) ("It is a well-established statutory presumption that a new congressional enactment will not be construed to have retroactive effect unless its language requires that result."); Sutherland Stat Const § 41.04 at 349 (5th ed.) ("Retrospective operation is not favored by the courts, however, and a law will not be construed as retroactive unless the act clearly, by express language or necessary implication, indicates that the legislature intended a retroactive application.").

prospective application, and may instead apply the statute retroactively. *Id.* at —— ——, 114 S.Ct. at 1501–02.[9] Finally, if the Court finds that Congress did intend for the statute to have retroactive application, the Court must determine whether or not such retroactive application is constitutional.

Thus, the Court first must examine the Securities Reform Act "to determine whether Congress has expressly prescribed the statute's proper reach." *Id.* at ——, 114 S.Ct. at 1505. The RICO Amendments themselves do not address their prospective or retrospective applicability. The Securities Reform Act, however, does include a section entitled "Applicability", which expressly addresses Congress's intent that the amendments to the 1933 and the 1934 Acts should be applied prospectively only. Specifically, Section 108 of the Act states that

> [t]he amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, commenced before and pending on the date of enactment of this Act.

Section 108 (Pub.L. No. 104–67, 109 Stat. 737, 758 (Dec. 22, 1995)). While this section makes it clear that Congress did *not* intend the Securities Reform Act to be applied retrospectively to actions brought under the securities laws, it is silent as to the potential retroactivity of the RICO Amendments.

Defendants nevertheless argue that § 108 indicates that Congress intended the RICO Amendments to apply retrospectively, that is to cases pending on December 22, 1995. Defendants argue that "[i]f Congress had intended for RICO claims to be excepted from the retroactive application of the new statute, then certainly it would have added language which would have excepted causes of action brought under" RICO in section 108. Mtn. for Summary Judgment of Herbert Pfeifer and Tiger Oil at 18 ("Tiger Mtn."). Because § 108 only demands prospectivity with respect to claims brought under the 1933 and 1934 Acts, Defendants argue that Congress must have intended for the Act to be given *retroactive* application with respect to non-securities claims, such as claims brought under RICO.

Defendants further rely on the canon of statutory construction known as *expressio unius est exclusio alterius*—the expression of one thing is the exclusion of another. That is, Defendants argue that because Congress specifically listed those portions of the Securities Reform Act that should be given prospective application, its failure to include the RICO Amendments in this list must signify that Congress did not intend the RICO Amendments to be applied *prospectively.* Retroactivity, according to Defendants, is the only other option.

A similar argument was made and rejected in *Landgraf.*[10] In particular, Landgraf cited to § 402(a) of the 1991 Civil Rights Act to support her claim that § 102 of the Act

---

9. In *Landgraf* the Court also addressed and resolved what had been perceived by many as an apparent tension between several of its previous retroactivity decisions. Specifically, in *Bradley v. Richmond School Bd.,* the Court explained that "a court is to apply the law in effect at the time it renders its decision ..." 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). On the other hand, in *Bowen v. Georgetown Univ. Hosp.,* the Court stated that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). The Court explained that, in fact, there is no tension between these two cases because in *Bradley,* as opposed to *Bowen,* the statute enacted a merely procedural change affecting the ability to recover attorney's fees and thus was not subject to the general presumption.

10. In *Landgraf,* which is the Supreme Court's most recent major statement on retroactivity, Plaintiff sued her employer alleging that she had been subjected to sexual harassment by a co-worker. After Plaintiff complained to her superiors about this harassment, the co-worker was transferred to another office. Nevertheless, Plaintiff quit her job and brought suit against her employer. The district court found that Plaintiff had been subjected to illegal sexual harassment, but that Plaintiff had not been constructively discharged. Therefore, the court found that Plaintiff was not entitled to injunctive relief—the only remedy available under Title VII at the time. During the pendency of Plaintiff's appeal, the 1991 Civil Rights Act was enacted. Section 102 of that Act amended Title VII to permit an intentional discrimination plaintiff to recover compensatory and punitive damages.

should be applied retroactively. Section 402(a) provides that "[e]xcept as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment." *Id.* at ——, 114 S.Ct. at 1493. Plaintiff argued that the introductory language of this section refers to §§ 402(b) and 109(c) of the Act, which both expressly provide that they are to be given prospective application only. Landgraf argued that Congress's reference in § 402(a) to two sections that are expressly prospective "create[s] a strong negative inference that all sections of the Act not specifically declared prospective apply to pending cases that arose before November 21, 1991." *Id.* The Supreme Court rejected this argument, stating that "[g]iven the high stakes of the retroactivity question, ... it would be surprising for Congress to have chosen to resolve that question through negative inferences drawn from two provisions of quite limited effect." *Id.* at ——–——, 114 S.Ct. at 1493–1494.

Likewise, the two courts that have addressed the asserted retroactivity of the RICO Amendments have also rejected this argument. *See District 65 Retirement Trust for Members of the Bureau of Wholesale Sales Representatives v. Prudential Securities, Inc.,* 925 F.Supp. 1551, 1569 (N.D.Ga. 1996) [hereinafter *District 65* ]; *Prudential Securities,* 930 F.Supp. at 80–81. In both cases, the district court refused to adopt. defendants' proposed negative inference. Instead, as Judge Pollack explained in *Prudential Securities,*

> [i]t is possible that this failure to provide a clear expression of intent resulted from the rushed nature of the debate and the proposal of the amendment. Whatever the reason, the statute does not include the type of clear expression that the RICO

provision is to apply retroactively required under the Landgraf decision.

*Prudential Securities,* 930 F.Supp. at 81.

This Court agrees with the trailblazing judges in *District 65* and *Prudential Securities.* As in *Landgraf,* it is unlikely that Congress chose to indicate its desire for retroactive application of the RICO Amendments—which will likely affect hundreds of pending cases—by such a roundabout method. Indeed, given the default rule in favor of prospective application, *see infra* at 1178–1179, it strains logic to argue that this "negative inference" creates the necessary express statement in favor of retroactivity.[11] This Court will not presume to eviscerate the presumption against retroactive application of statutes by inferring Congress's intentions based on such tenuous evidence.

Defendants further rely upon their interpretation of the legislative history of the Securities Reform Act—and in particular the RICO Amendments—to impart the necessary clear expression of Congressional intent. Such a reliance on the statements of legislators in the heat of battle, however, is fraught with difficulties.[12] Moreover, as the Court will explain, in this case the legislative history simply does not supply the necessary evidence of an intent to apply the statute retroactively.

As a starting point, the Court observes that Defendants have not cited to anything in the legislative history that expressly addresses the retrospective or prospective application of this statute. Instead, the cornerstone of Defendants' legislative history argument is the comments of Representative McCollum, who spoke in favor of the bill. Mr. McCollum stated, *inter alia,* that

> [t]he amendment offered by the gentleman from California will begin the process of

---

11. Clearly, Congress knows how to express clearly its intention that a statute should be applied retroactively. *See, DeVargas v. Mason & Hanger–Silas Mason Co., Inc.,* 911 F.2d 1377, 1385 n. 7 (10th Cir.1990) (citing statutes that expressly indicate Congress's desire for retroactive application).

12. As Justice Robert Jackson stated:
 [w]hen we decide from legislative history, including statements of witnesses at hearings,

> what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them.... That process seems to me to be not interpretation of a statute but creation of a statute.

*United States v. Public Util. Comm'n of California,* 345 U.S. 295, 319, 73 S.Ct. 706, 719, 97 L.Ed. 1020 (1953) (Jackson, J., concurring).

restoring the civil RICO statute to the uses that Congress intended. This amendment will put an immediate stop to one of the greatest abuses of the civil RICO statute.

Pl.Exh.B. at 108.[13] Defendants argue that this statement evinces a *clear* Congressional intent to retroactively amend and restore civil RICO. This statement (as well as the other comments cited by the *Prudential Securities* Court) is ambiguous at best. Nothing in it can be said to contain a clear expression of Congressional intent, as required by *Landgraf.*

Further, Mr. McCollum's statement that the RICO Amendments would "restor[e] the civil RICO statute to the uses that Congress intended. . . ." does not provide the required explicit statement of intent. It simply expresses Congress's desire to change the course of RICO litigation. Whether these changes should apply to cases already pending on the date of enactment is a wholly separate matter. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, ――――, n. 7, 114 S.Ct. 1510, 1516–17, n. 7, 128 L.Ed.2d 274 (1994) ("We do not suggest that Congress's use of the word 'restore' necessarily bespeaks an intent to restore *retroactively.* . . . Instead, 'to restore' might sensibly be read as meaning 'to correct, from now on.' ") (emphasis in original); *DeVargas v. Mason & Hanger–Silas Mason, Co., Inc.,* 911 F.2d 1377, 1385 (10th Cir.1990) (finding Congress' statement that it intended to " 'restore' section 504 [of the Rehabilitation Act of 1973] to its pre-*Grove City College* [*v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516] [ (1984) ] interpretation" was not a clear expression that Congress intended the amendment to be applied retroactively). As the *DeVargas* court explained, "an ambiguous statement in the Senate report on the need for action does not amount to the clear intent required to invoke retroactivity." *Id.* at 1386.

Likewise, the procedural history surrounding the inclusion of the RICO Amendments in the Securities Reform Act militates against a finding that Congress considered and affirmatively decided to create legislation that would be applied retrospectively. To the contrary, the legislative history indicates that the RICO Amendments were an eleventh hour addition to the Securities Reform Act. *Prudential Securities,* 930 F.Supp. at 78 (discussing the genesis of the RICO Amendments and noting that the "Committee on Rules [had] a special hearing last night to put in order a nongermane amendment to a piece of legislation that has nothing to do with the business, . . ."). The RICO Amendments did not go through the normal legislative hearings process and were not subject to the usual level of discussion. Pl.Exh.B. at 109 ("We are amending a statute . . . without ever having a word of hearings or a bit of evidence or testimony taken on the subject . . .") (comments of Mr. Dingell).

█ The late inclusion of the RICO Amendments makes this Court even less inclined to find that Congress was expressing a desire that the RICO Amendments be applied retrospectively. To the contrary, this history of eleventh hour additions to the Act detracts from Defendants' negative inference argument.[14] Given the rushed, last-minute nature of the RICO Amendments, it beggars credulity for Defendants to argue that Con-

---

**13.** In addition to this statement, the Court in *Prudential Securities* cited several additional comments of the same ilk in the legislative history. For example, Representative Conyers stated that "[w]hat we are saying is that all of the major fraud cases in which RICO busted people who were bilking millions of dollars . . . is now going to be thrown in the trash heap and we will not need it anymore." *Prudential Securities,* 930 F.Supp. at 78. Representative McCollum is also quoted as saying that "I intend to introduce RICO reform. It is my hope that the subcommittee will bring forward legislation to help ensure that the RICO statutes are used in the manner

that Congress originally intended. In the interim, however, this amendment will stop some of the most egregious abuses of the civil RICO statute." *Id.* None of these statements, however, expressly indicates an intent regarding the potential retrospective or prospective application of the RICO Amendments.

**14.** At oral argument Defendants countered that the fact that this was a last minute amendment means that the RICO Amendments stuck out like a sore thumb and received additional attention from the members of Congress who were asked to vote on the Securities Reform Act.

gress intended to create the fine distinction upon which their negative inference argument is based. It is far more likely that § 108's express statement of prospectivity was simply overlooked. The Court, therefore, finds that Congress did not express a clear intent to endow the RICO Amendments with retrospective effect. Because the language of the statute does not itself clearly resolve the question, the Court must determine which default rule of statutory construction should apply by looking to the effect of the statutory amendment. If the court finds that the statute will operate retroactively, it must apply the traditional presumption against retroactivity. *See Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1505. A statute is said to operate retroactively if it will "impair rights a party possessed when he acted, or increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at ——, 114 S.Ct. at 1505. If the statute will not operate retroactively, for example if it merely alters the procedural rules to be applied in a case, then the court should apply the law in effect at the time of decision. *See id.* at —— ——, 114 S.Ct. at 1501–02.

In this case, the RICO Amendments operate retroactively by impairing a right that the Plaintiffs possessed when they acted.[15] That is, when Plaintiffs filed their complaint securities fraud was a viable and permissible predicate act for RICO. Further, when Plaintiffs commenced this litigation, the statute of limitations for securities fraud had already run. *See supra*, section A at 7–8. Thus, when Plaintiffs filed their Complaint, civil RICO was the only federal avenue left open to redress Defendants' alleged frauds. If the RICO Amendments are applied retroactively to withdraw securities fraud as a permissible predicate act in this case, "plaintiffs' ability to recover for actions which may have violated federal law" will be impaired. *District 65*, 925 F.Supp. at 1570. Accordingly, the Court finds that the RICO Amendments operate retroactively.

Defendants, nevertheless, argue that the presumption against retroactivity does not apply because the RICO Amendments constitute a mere procedural change. This contention takes an overly cramped view of the meaning of the RICO Amendments. Defendants base this argument on their belief that the impetus driving the RICO claims in *this* case is Plaintiffs' desire for attorney's fees— which Plaintiffs could not obtain if they had pursued their claims under the securities laws. Whether or not this is what is motivating these Plaintiffs is a matter that is in dispute and is of little concern to the Court. The determination of whether the RICO Amendments have retroactive application must be driven by the effect of the law in all cases, not simply by the underlying motivations of one set of litigants. Simply because, *in this case*, RICO claims may (or may not) have been added to the Complaint solely in order to enable the Plaintiffs to obtain attorney's fees does not mean that the amendment of the statute will always have such an effect.

Given that the RICO Amendments operate retroactively, *Landgraf* teaches that the Court should apply the general presumption against retroactive application of statutes, absent a clear statement from Congress that it intends retroactive application. As the Court has already explained, Congress did not include such a clear statement in the RICO Amendments. Accordingly, the Court finds that the RICO Amendments should be applied prospectively only and will not act to divest Plaintiffs of their RICO claims in this case. Defendants' motion for summary judgment with respect to this argument is therefore **DENIED**. Because the Court finds that the RICO Amendments do not apply retroactively, it need not address whether retroactive application of the statute would be constitutional.

2. *Statute of Limitations.*

■ Even if Plaintiffs' RICO claims were not retroactively vitiated by the RICO Amendments, Defendants argue that Plaintiffs' RICO claims must be dismissed as time-barred. Specifically, Defendants argue that, because the predicate acts of securities

---

**15.** Clearly, the RICO Amendments neither impose new duties with respect to transactions nor increase Defendants' liability for past conduct. *See District 65*, 925 F.Supp. at 1569.

fraud under Rule 10b–5 are time-barred, Plaintiffs' RICO claims are also time-barred.

 Defendants' position misapprehends the law in this matter. Civil RICO claims are subject to a four year statute of limitations. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). A RICO claim "accrues when 'the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering.'" *Gurfein v. Sovereign Group,* 826 F.Supp. 890, 909 (E.D.Pa.1993). The fact that one or more of the predicate acts that constitute the pattern of racketeering activity are themselves time-barred—and thus cannot support an independent claim for relief—is of no consequence.[16] As Judge Louis Pollak explained,

> [t]he fact that plaintiffs' securities claim is barred under the statute of limitations has no bearing on the legitimacy of their RICO claim. '[A] civil RICO cause of action is not to be identified with its underlying predicate acts in determining statute of limitations issues.'

*Id.,* n. 23 (quoting *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 925 (3d Cir.1992)). Here, Plaintiffs allege—and for the purposes of this motion Defendants do not dispute—that they first discovered the alleged fraud underlying their RICO claims in the summer of 1992, less than two years before they commenced this litigation. Accordingly, notwithstanding the fact that their Rule 10b–5 claim is time-barred, Plaintiffs' RICO claims were brought within the limitations period and are therefore timely. Accordingly, Defendants' motion for summary judgment on this ground is **DENIED.**

### C. THE SIXTEENTH AND SEVENTEENTH CLAIMS FOR RELIEF— THE OHIO CORRUPT ACTIVITIES ACT.

#### 1. *Statute of Limitations.*

 Defendants next argue that the Sixteenth and Seventeenth Claims for Relief, for violations of the Ohio Corrupt Activities Act, are also (in part) time-barred. The Ohio Corrupt Activities Act, R.C. § 2923.31 *et seq.,* prohibits racketeering activity much as the federal RICO Act does. Section 2923.34(K) of the Act provides that

> [n]otwithstanding any other provision of law providing a shorter period of limitations, a civil proceeding or action under this section may be commenced at any time within five years after the unlawful conduct terminates or the cause of action accrues or within any longer statutory period of limitations that may be applicable.

R.C. § 2923.34(K).

Defendants argue that, with respect to the transactions that occurred in 1983 and 1986 (the "1983 and 1986 Wells"), Plaintiffs' claims are time-barred because the allegedly unlawful conduct *terminated* more than five years before Plaintiffs commenced this litigation. Defendants' position on this point appears to be somewhat disinguenuous. As Plaintiffs correctly note, the plain language of § 2923.34(K) permits a plaintiff to commence litigation within *either* five years of the termination of the wrongful conduct *or* five years after the cause of action accrued. R.C. § 2923.34(K). Plaintiffs argue that their claims for relief *accrued* in 1992 when they discovered Defendants' fraud.

No Ohio court has directly addressed when a claim accrues under the Ohio Corrupt Activities Act. In fact, the only case that addresses the statute of limitations provisions of the Ohio Corrupt Activities Act at all, does so in dicta. *See Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 656 F.Supp. 49, 80–81 (S.D.Ohio 1986). In *Cincinnati Gas & Elec.,* Judge Spiegel briefly analyzed the limitations periods in § 2923.34(K) in order to determine when a federal RICO cause of action "accrues." The court held that "the statute begins to run [on a federal RICO claim] from the time the plaintiffs knew or should have known of the fraud because it is

---

**16.** Indeed, the *Prudential Securities* Court noted this fact when it found that the RICO Amendments were not merely procedural changes. As the court explained, the RICO Amendments "impair the plaintiffs' ability to recover for actions which may have violated federal law because it would strip the plaintiffs' complaint of RICO claims after the statute of limitations for securities fraud claims has likely expired." *Prudential Securities* at 79.

consistent with our analysis regarding plaintiffs' state common law fraud claims as well as with the second alternative set forth in Ohio Rev.Code § 2923.34(K)." *Id.* at 81. Thus Judge Spiegel indicated his view that under § 2923.34(K), a cause of action accrues—triggering the running of the statute of limitations—when the Plaintiff knows or should have known of the fraud.

Further, under Ohio law a cause of action for fraud does not accrue—triggering the beginning of the limitations period—"until the fraud is discovered." R.C. § 2305.09; *see also Burr v. Stark Cty.Bd. of Commrs.,* 23 Ohio St.3d 69, 76, 491 N.E.2d 1101 (1986) ("[t]he cause does not accrue until the fraud and wrongdoer are actually discovered"). Given that various forms of fraud—such as mail fraud and wire fraud—serve as the underlying predicate acts for racketeering claims under the Ohio Corrupt Activities Act, it seems likely that the General Assembly intended to include a discovery and accrual rule similar to the one that is applied to general fraud claims.

Moreover, Defendants' argument would render the second portion of the limitations provision mere surplusage. Section 2923.34(K) provides two possible events that may trigger the running of the limitations period—the termination of the unlawful conduct or the accrual of the cause of action. If, as Defendants seem to argue, the cause of action must begin to accrue when the wrongful conduct terminates, there would be no reason for the General Assembly to have included the second possible triggering event—the accrual of the cause of action.

It appears that an Ohio court would apply a form of the discovery rule applied to fraud cases and hold that a claim for relief under the Ohio Corrupt Activities Act accrues—triggering the running of the limitations period—when the fraud or wrongful conduct has been or should have been discovered. Ac-

cordingly, there is at least a dispute of fact as to whether Plaintiffs' claims under the Ohio Corrupt Activities Act were brought within the limitations period.

### 2. *The Merits.*

Defendants further argue that summary judgment on these claims is appropriate because Plaintiffs cannot produce any evidence to establish that Defendants committed the alleged predicate acts. Ohio Revised Code § 2923.34(B) provides that a private party seeking to recover under the Ohio Corrupt Activities Act must allege a pattern of corrupt activity that includes at least one predicate act that is not a form of securities fraud, mail or wire fraud, or the interstate transportation of stolen property or securities. R.C. § 2923.34(B).[17] Defendants argue that, while Plaintiffs have included a "bald claim of theft by deception" in the Complaint, Plaintiffs cannot produce any evidence of this alleged predicate act.[18]

The Court finds that Plaintiffs have produced sufficient evidence to create a dispute of fact as to their claim of theft by deception. In particular, Plaintiffs point to their allegations and the supporting evidence regarding the alleged fraud in connection with the Stockport Sand & Gravel and the Schott Unit Leases. As the Court explains more fully *infra,* the evidence is in dispute as to whether the Development Agreement required Defendants to transfer to Plaintiffs an interest in the entire approximately 150 acres of the two leases, or instead in a smaller 80 acre parcel. Accordingly, summary judgment is inappropriate and Defendants' motion is **DENIED** as to these claims.

### D. THE FIRST THROUGH TWELFTH CLAIMS FOR RELIEF—BREACH OF CONTRACT, FRAUD AND BREACH OF FIDUCIARY DUTY.

Defendants next argue that the First through Twelfth Claims for Relief are all time-barred. In particular, Defendants

---

**17.** Specifically, Section 2923.34(B) states that the pattern of corrupt activity alleged by an injured person or person threatened with injury shall include at least one incident other than a violation of division (A)(1) or (2) of section 1707.042 [1707.04.2] or division (B), (C)(4), (D), (E), or (F) of section 1707.44 of the Revised Code, of 18 U.S.C. 1341, 18 U.S.C. 1343,

18 U.S.C. 2314, or any other offense involving fraud in the sale of securities.
Ohio R.C. § 2923.34(B).

**18.** The parties do not dispute that theft by deception would be a proper predicate act under the statute.

argue that the two-year limitations period found in the Ohio Blue Sky Law should apply to bar these claims. Section 1707.43 of the Revised Code provides, in pertinent part, that

> [n]o action for the recovery of the purchase price as provided for in this section, and no other action for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707. of the Revised Code, shall be brought more than two years after the plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person or director were unlawful, or more than four years from the date of such sale or contract for sale, whichever is the shorter period.

Ohio R.C. § 1707.43. Defendants argue that § 1707.43 applies to Plaintiffs' claims for breach of contract, breach of fiduciary duty and fraud because all of these claims arise from the sale of securities. Plaintiffs, on the other hand, argue that these claims are not barred by § 1707.43 because that section applies only to claims of fraud made by purchasers of securities and not claims by defrauded sellers.

Ohio Revised Code Section 1707.43 applies to claims arising out of sales contracts made in violation of Chapter 1707 of the Revised Code. The parties do not dispute that Chapter 1707 does not address fraud by a purchaser of securities, but instead is limited to fraud by a seller. Further, the plain language of the statute emphasizes its role of protecting *purchasers* from fraudulent sales. Indeed, § 1707.43 is entitled "Remedies of *purchaser* in unlawful sale". R.C. § 1707.43 (emphasis added). Likewise, the limitations provisions apply to "action[s] for the recovery of the *purchase price* as provided for in this section ..." and "action[s] for any recovery based upon or arising out of a sale or contract for sale made in violation of Chapter 1707 ..." R.C. § 1707.43.

In addition, at least one appellate court has refused to apply this section to a claim by a seller of securities that he was defrauded by the purchaser. In *Plantation Hous. Partners Ltd. v. Lindsey,* 1991 WL 34726 (Cuyahoga Cty 1991), Plantation sued the purchas-er of a limited partnership interest for money due on three promissory notes. The defendant raised the statute of limitations set forth in § 1707.43 as a defense. The Court of Appeals affirmed the trial court's holding that this section did not apply to claims by a defrauded seller. The Court explained that

> R.C. 1707.43 is styled as "Remedies of purchaser in unlawful sale." Further, the plain language of the statute addresses the remedy for a purchaser to recover his purchase price for securities sold in violation of R.C. 1707. Plantation, however, is not a purchaser seeking recovery of its purchase price, but rather is a seller/creditor seeking payment of a debt owed. This cause of action is not brought under the aegis of R.C. 1707 and so the R.C. 1707.43 statute of limitations is inapplicable to it.

*Id.* at \*4; *see also Toledo Trust Co. v. Nye,* 392 F.Supp. 484, 491 (N.D.Ohio 1975) ("It is clear after examining the statutory scheme that the Ohio Blue Sky Law has no provision for the action complained of by the plaintiff, which is an action by a seller claiming fraud by a purchaser in the sale of a security").

Defendants rely on *Hater v. Gradison Div. of McDonald & Co. Sec., Inc.,* 101 Ohio App.3d 99, 655 N.E.2d 189 (Hamilton Cty 1995), to support their argument that the Ohio Blue Sky limitations period should be applied to Plaintiffs' claims in this case. In *Hater,* however, plaintiffs were the purchasers of the securities, as opposed to the sellers. Thus, the only question at issue in *Hater* was whether the provisions of § 1707.43 applied to a *purchaser's* common law fraud claims.

■■■■ This Court agrees with the *Plantation Housing Partners* Court that the two year statute of limitations found in the Ohio Blue Sky law does not apply to the claims of a defrauded seller. Thus, the limitations periods that would normally apply to claims for common law breach of contract, fraud and breach of fiduciary duty will be applied in this case.[19] Defendants do not argue that Plaintiffs' claims are time-barred under these limitations periods. Accordingly, Defendants' motion for summary judgment as to the First through Twelfth Claims for Relief

---

**19.** Under Ohio law, claims for breach of a written contract are subject to a 15 year statute of limitations. R.C. § 2305.06. Breach of an oral contract is subject to a six year statute of limita-

is DENIED as it relates to the applicability of the statute of limitations.

### E. THE FOURTH CLAIM FOR RELIEF—FRAUD IN CONNECTION WITH THE UNDERPRODUCTION OF WELLS

 Plaintiffs' Fourth Claim for Relief alleges that Defendants deliberately and falsely stated that certain of the wells were no longer economically viable in an attempt to induce Plaintiffs to assign their interests to Mid–Ohio and J & P. Compl. ¶¶ 48–49. In addition, Plaintiffs allege that Defendants in fact "caused Tiger Oil to underproduce the wells prior to Plaintiffs' assignments of their respective interests...." Compl. ¶ 48. Defendants now move for summary judgment on the basis that Plaintiffs have no evidence to support their claims of deliberate underproduction.

 In support of their claim, Plaintiffs offer production records for two wells, the No. 5 Chickwak well and the Chickwak–Saling No. 3 well. Pl.Exhs. E1 and E2. These records show that the production levels from the wells steadily decreased prior to Plaintiffs' transfer of their interests. After Plaintiffs had transferred their interests, however, the production figures for these wells appear to have increased. Plaintiffs argue that, based on these figures, a rational jury could determine that Defendants intentionally depressed the production levels for these wells until after Plaintiffs had parted with their interests in the wells. Defendants counter that Plaintiffs are reading too much into these figures. Defendants explain that in fact, the apparent rise in production is basically an accounting matter, due to a change in the way that the production from these wells was metered after Plaintiffs parted with their interests in the wells.[20]

This difference of opinion regarding the meaning of the production figures demonstrates that summary judgment is not appropriate at this juncture. Clearly there is a dispute of fact as to whether the increase in production after Plaintiffs had parted with their interests was the result of fraud or a different manner for metering the wells. Accordingly, Defendants' motion for summary judgment on this claim is **DENIED**.

### F. THE SECOND AND ELEVENTH CLAIMS FOR RELIEF—BREACH OF CONTRACT AND FRAUD.

 Plaintiffs' Second and Eleventh Claims for Relief allege breach of contract and fraud (respectively) in connection with Defendants' alleged failure to make royalty payments. Defendants move for summary judgment on the basis that Plaintiffs have no evidence to support their contention that Defendants failed to make any payments owed to Plaintiffs. Plaintiffs' response to this argument demonstrates the fundamental error of believing that less is more when opposing a motion for summary judgment. That is, Plaintiffs contend that "there *will be* evidence from Tiger's own production records of months of production which Plaintiffs were entitled to and for which they were never paid." Opp. to Tiger Mtn. at 23 (emphasis added). Plaintiffs, however, did not produce any of this evidence in opposition to the motion. Accordingly the Court will **GRANT** Defendant's Motion for summary judgment on the Second and Eleventh Claims for Relief.

### G. THE SIXTH, SEVENTH AND EIGHTH CLAIMS FOR RELIEF— BREACH OF CONTRACT, FRAUD AND BREACH OF FIDUCIARY DUTY IN CONNECTION WITH THE STOCKPORT–SCHOTT DEVELOPMENT AGREEMENT.

 Defendants next move for summary judgment on Plaintiffs' Sixth, Seventh and

---

tions. R.C. § 2305.07. Claims for common law fraud must be brought within four years of discovery of the fraud. R.C. § 2305.09. Finally, claims for breach of fiduciary duty also are subject to a four year statute of limitations. *Id.*; *Nixon v. Bank One of E. Ohio, N.A.,* 74 Ohio App.3d 550, 554, 599 N.E.2d 742 (Franklin Cty 1991).

**20.** Defendants, while asserting that Herbert Pfeifer testified to this, have not cited to the appropriate portions of his testimony or attached excerpts from the deposition transcript. The Court is not required to comb through the record looking for this evidence. *See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir. 1989) (" '[t]he trial court no longer has a duty' to search the entire record to establish that it is bereft of a genuine issue of material fact.").

Eighth claims for relief on the grounds that the undisputed facts establish that Defendants are not liable for breach of contract, fraud or breach of fiduciary duty as alleged in these claims for relief.

The Sixth, Seventh and Eighth claims for relief relate to Plaintiffs' investment in two natural gas leases in Washington County: the Stockport Sand & Gravel Lease and the Schott Unit Lease. According to Plaintiffs, in 1977 Baker entered into a Development Agreement with Tiger for the drilling and completion of a natural gas well on the Stockport Sand & Gravel Lease and/or the Schott Unit Lease. Together these two leaseholds encompass approximately 150 acres. Plaintiffs argue that under the terms of the Development Agreement, Tiger was to transfer to Baker a 75% interest in the combined 150 acre leases. Instead, however, Tiger assigned to Baker a 75% interest in a smaller 80 acre parcel. Further, Tiger later drilled a second well on land that would have been covered by the 150 acre combined leasehold. Tiger did not share the revenues from this second well with Plaintiffs, as Plaintiffs argue that it should have under the Development Agreement.

The Court finds that a genuine dispute of fact exists as to the size of the leasehold in which Plaintiff had an interest under the Development Agreement. In support of their claims, for example, Plaintiffs point to the language of the drilling agreement which refers to the "Stockport Sand & Schott Unit located in Lot 8, Waterford Township, Washington County, Ohio, consisting of *150 acres more or less.*" Tiger Mtn., Exh. B–5. Defendants, on the other hand, point to a plat map which describes the Stockport Sand & Schott Unit as an 80 acre unit. Tiger Mtn. Exh. B–3. Defendants downplay the language in the drilling agreement, arguing that the difference in acreage is of no consequence. Nevertheless, a reasonable jury could find, based on the language in the Drilling Agreement, that Defendants were supposed to assign to Baker a 75% interest in the combined 150 acre leasehold. Accordingly, the Court will DENY summary judgment as to these claims.

## H. PROPER PARTIES

■ Defendants Mid–Ohio, Henrietta Pfeifer, J & P and Gerald Pfeifer additionally argue that summary judgment is appropriate on all claims that attempt to charge them with personal liability.[21] These defendants argue that they played no role in any of the allegedly improper conduct underlying Plaintiffs' claims for relief in this case.[22] Defendants' argument appears to boil down to one simple (although legally incorrect) proposition—that they cannot be held liable for any fraud-based claims for relief because they did not actively play a role in inducing the Plaintiffs to act.

■ A defendant may be held liable for fraud notwithstanding the fact that the defendant did not himself make the fraudulent statement or omission.[23] For example, a corporate officer may be held personally liable for frauds committed by the corporation. *Centennial Ins. Co. of New York v. Vic Tanny Int'l of Toledo, Inc.,* 46 Ohio App.2d 137, 141 (Lucas Cty.1975) ("Directors and corporate officers generally may be personally liable for fraud even though the corporation may be liable also."). In order to hold the officer liable, "it must be shown that he knew the statement was false, that he intended it to be acted upon by the parties seeking

---

21. In particular, Defendants Henrietta Pfeifer and Mid–Ohio argue that summary judgment is appropriate as to 4th, 13th, 14th, 15th, 16th, and 17th claims for relief. Defendants Gerald Pfeifer and J & P argue that summary judgment is appropriate in their favor as to all claims.

22. In essence, these Defendants are arguing that, while they contest that there was any fraud or misconduct involved in Tiger's transactions with the Plaintiffs, if there was an impropriety Tiger and Herbert Pfeifer alone are liable for it.

23. A party may be held liable for fraud based on that party's silence under circumstances that

would require the party to speak. *See Miles v. McSwegin,* 58 Ohio St.2d 97, 99, 388 N.E.2d 1367 (1979). "[A] party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading." *Id.* at 100, 388 N.E.2d 1367.

redress, and that it was acted upon to the injury of the party." *Id.* Both Henrietta and Gerald Pfeifer were officers or directors of Defendant Tiger Oil, and thus might be held liable for frauds committed by Tiger. Whether or not Henrietta or Gerald had the requisite knowledge and intent to render them liable for Tiger's alleged misconduct is a question of fact that is in the province of the jury. However, based on the fact that both Henrietta and Gerald were officers of Tiger, as well as close relations of Herbert Pfeifer, a reasonable jury could infer that they did in fact know of Tiger's alleged frauds and tortiously remained silent. Accordingly, summary judgment will be **DENIED** in connection with the motions of Henrietta Pfeifer and Gerald Pfeifer.

 Likewise, the Court finds that there are disputed issues of fact regarding Mid–Ohio's and J & P's participation in and potential liability for frauds committed by Tiger. For example, both Mid–Ohio and J & P were the beneficiaries of the alleged frauds and misconduct. Further, Mid–Ohio and J & P were operated by Henrietta and Gerald Pfeifer (respectively) who were also officers and directors of Tiger Oil. Under these circumstances, a reasonable jury could find that Mid–Ohio and J & P were aware of—and participants in—any misconduct committed by Tiger Oil or Herbert Pfeifer. Accordingly, the Court also will **DENY** summary judgment in connection with the motions of Mid–Ohio and J & P.

### III. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendants' motion for summary judgment as to 1) the Thirteenth Claim for Relief on the grounds that it is time-barred and 2) and the Second and Eleventh Claims for Relief on the grounds that Plaintiffs have failed to produce any evidence to support these claims. The Court will **DENY** summary judgment with respect to the remaining arguments propounded by Defendants.

**IT IS SO ORDERED.**