Donald M. ROWE, J. Rowe, Masella B. Rowe, and California Soap Co., Inc., Plaintiffs,

v.

MARIETTA CORPORATION and John Nadolski, Defendants.

No. 92–2963–D.

United States District Court, W.D. Tennessee, Western Division.

Jan. 29, 1997.

Alan E. Glenn, John McQuiston, II, Evans & Petree, Memphis, TN, for Donald M. Rowe.

Jim N. Raines, Glanker Brown Gilliland Chase Robinson & Raines, Memphis, TN, Benjamin E. Rosenberg, Shereff Friedman Hoffman & Goodman, New York City, for Marietta Corporation.

Abigail Pessen, Scoppetta & Seief, New York City, for John S. Nadolski.

## ORDER DENYING DEFENDANT MARIETTA CORPORATION'S MOTION IN LIMINE ON DAMAGES AND GRANTING DEFENDANT MARIETTA CORPORATION'S MOTION FOR JUDGMENT ON THE PLEADINGS

DONALD, District Judge.

Before the court are (1) the motion *in limine* of defendant Marietta Corporation (Marietta) to dismiss Counts I, V, and VI of the Second Amended Complaint (SAC) as time-barred and to preclude the plaintiffs (collectively, Rowe) from claiming any damages from alleged shortfalls in earn out calculations for fiscal years 1989, 1991 and 1992,[1] and (2) the motion of Marietta for

---

**1.** Rowe has notified the Court that he has withdrawn Count XI (breach-of-merger contract) of the SAC because Rowe believes an election of remedies between contract and tort may be necessary. Marietta asserts that the issues regarding the earn out agreement, *e.g.*, whether Rowe should be estopped from challenging the admin-istrative details of the earn out components and calculations because he did not raise his challenge under the terms dictated by the contract, are not rendered moot by the withdrawal of Count XI. The Court will treat Marietta's motion *in limine* as to Count XI as though it were not withdrawn.

judgment on the pleadings on Count IX of the SAC, pursuant to Federal Rule of Civil Procedure 12(c).

## DISPOSITION OF MOTION IN LIMINE AS CONVERTED MOTION FOR SUMMARY JUDGMENT

While Marietta styled this proceeding as a motion *in limine*, the Court notes that, in substance, this motion seeks the dismissal of three counts of Rowe's securities law claims on limitations grounds and preclusion of Rowe's breach of contract claim as time-barred pursuant to the express terms of the contract.

The function of a statute of limitations is to bar stale claims. *Black Law Enforcement Officers v. City of Akron*, 824 F.2d 475, 482–83 (6th Cir.1987) (citing *American Pipe & Constr. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974)). A statute of limitations is neither a rule of evidence nor bearing on the admissibility of evidence. *Black Law Enforcement Officers*, 824 F.2d at 483 (quoting *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975)).

A defense predicated on a statute of limitations is an affirmative defense. FED.R.CIV.P. 8(c). The Court construes Marietta's assertion of a contractual limitations or estoppel argument, vis-à-vis Rowe's breach of contract claim, as *volenti non fit injuria*, a defense not listed in FED.R.CIV.P. 8(c), but viewed as an affirmative defense nonetheless. 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1271, note 27 (2d ed.1990).

Generally, an affirmative defense must be raised for the first time in the defendant's answer, or may be brought by motion prior to filing an answer. FED.R.CIV.P. 8(c), 12(b)(6). Failure to raise an affirmative defense in accordance with the Federal Rules of Civil Procedure may constitute waiver of that defense. *See Colonial Refrigerated Transport, Inc. v. Worsham*, 705 F.2d 821 (6th Cir.1983); FED.R.CIV.P. 8(c), 12(b)(6). An affirmative defense which has not been waived may also be raised after the close of pleadings in a motion for judgment on the pleadings. FED.R.CIV.P. 12(c). In Paragraph 172 of its Answer to the SAC, Marietta asserts, as to Counts I, V & VI of the SAC, the affirmative defense of limitations. Marietta posits its affirmative contractual defense to Rowe's breach-of-merger contract claim (Count XI) at Paragraphs 192 and 193 of its Answer to the SAC.

Accordingly, the Court elects to treat this motion *in limine* as a motion to dismiss pursuant to FED.R.CIV.P. 12(c). *Cf. General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119 (6th Cir.1990) (motion *in limine* based on statute of limitations construed by court as motion for judgment on the pleadings). Marietta supports its motion *in limine* with deposition testimony and other evidence outside of the pleadings. Rowe's response in opposition also relies on matters outside of the pleadings. Because Marietta and Rowe both rely on matters outside the pleadings, and because the Court finds that neither party will be surprised or prejudiced by conversion, *see Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir.1975), the Court, guided by FED.R.CIV.P. 12(c), elects to convert the instant motion to a motion for summary judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986). The burden on the party moving for summary judgment may be discharged by pointing out that there is an absence of evidence to support the nonmoving party's case. *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 182 (6th Cir.), *cert. denied*, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992) (the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The Court may also consider any material that would be admissible or usable at trial,

including exhibits that have been properly made a part of an affidavit. 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40, § 2722, at 56 (2d ed.1983).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party. *Id.* The party opposing the motion must "do more than simply show that there is some meta-physical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In short, the nonmoving party may not oppose a properly supported motion for summary judgment by mere reliance on the pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. "[I]n the 'new era' of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson, Celotex* and *Matsushita,* trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence." *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995). "If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion must be granted." *Id.*

Marietta asserts the affirmative defense of limitations, based on the Supreme Court's holding in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111

S.Ct. 2773, 115 L.Ed.2d 321 (1991). In *Lampf,* the Supreme Court held that the applicable limitations and repose periods for private rights of action under 15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934) and 17 C.F.R. 240.10b–5 (Rule 10b–5) were one and three years, respectively. *Lampf,* 501 U.S. at 362–364, 111 S.Ct. at 2782.

Although the subject of considerable disagreement among commentators and courts,[2] *see, e.g.,* Lewis D. Lowenfels and Alan R. Bromberg, *SEC Rule 10b–5 and Its New Statute of Limitations: The Circuits Defy the Supreme Court,* 51 BUS.LAW. 309 (1996), the one-year limitation period in *Lampf* is read in this circuit to run "from the time the fraud was discovered or should have been discovered." *Ockerman v. May Zima & Co.,* 27 F.3d 1151, 1155 (6th Cir.1994). Other circuits have issued similar interpretations of *Lampf's* dispositive issue—i.e., that the limitations period for § 10(b) actions operates from an inquiry notice standard, as opposed to an actual notice standard. *See, e.g., Dodds v. Cigna Sec., Inc.,* 12 F.3d 346 (2nd Cir. 1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994); *Chance v. F.N. Wolf & Co., Inc.,* No. 93–2390, 1994 WL 529901 (4th Cir. Sept. 30, 1994); *Topalian v. Ehrman,* 954 F.2d 1125 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *LaSalle v. Medco Research, Inc.,* 54 F.3d 443 (7th Cir.1995); *Anixter v. Home–Stake Prod. Co.,* 939 F.2d 1420, *reh'g granted in part,* 947 F.2d 897 (10th Cir.1991), *vacated on other grounds sub nom. Dennler v. Trippet,* 503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992). Because the Court of Appeals for the Sixth Circuit has clearly interpreted *Lampf* to impose a one-year, in-

---

**2.** The private right of action under § 10(b) is an implied right, judicially created and without a federal statute of limitations. *Freeman v. Laventhol & Horwath,* 34 F.3d 333, 338 (6th Cir.1994); *see Kardon v. Nat'l Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). Prior to *Lampf,* federal courts borrowed limitations periods from states for application to § 10(b) actions. In *Lampf,* the Supreme Court chose to apply the limitations period found at 15 U.S.C. § 78i(e)—Section 9(e) of the Securities Exchange Act of 1934—to private causes of action under § 10(b), specifically adopting § 9(e) of the 1934 Act over § 13 of the Securities Act of 1933, 15 U.S.C. 77m. *Lampf,* 501 U.S. at 364, note 9, 111 S.Ct. at 2782, note 9.

In pertinent part, § 9(e) of the 1934 Act reads, "No action shall be maintained ... unless brought within one year after the discovery of the facts constituting the violation ...". 15 U.S.C. § 78i(e). Section 13 of the 1933 Act, however, states in pertinent part, "No action shall be maintained ... unless brought within one year after the discovery of the untrue statement or the omission, *or after such discovery should have been made* ...". 15 U.S.C. § 77m (emphasis provided). Commentators and courts have iterated that the distinction in terminology between the 1934 Act and the 1933 Act is significant. *See, e.g.,* Lowenfels and Bromberg, *supra,* and cases cited therein at 326, note 95.

quiry notice limitations period on private plaintiffs bringing § 10(b) actions, *Ockerman, supra*, this Court must apply the same one-year, inquiry notice limitations period to Rowe's § 10(b) claim *sub judice*. The court will apply the one-year, inquiry notice statute of limitations from § 18(c) of the 1934 Act [3] to Count V of the SAC, brought under § 18(a) of the 1934 Act.[4] *See In re General Dev. Corp. Bond Litig.*, 800 F.Supp. 1128 (S.D.N.Y.1992), *aff'd sub nom Menowitz v. Brown*, 991 F.2d 36 (2nd Cir.1993). With respect to Count VI of the SAC (15 U.S.C. 78t), it does not have an integrated limitations period, and the Court is directed by *Lampf* to look to the most closely analogous federal statute—in this case § 15 of the 1933 Act, 15 U.S.C. § 78t. Section 15 does not have its own limitations period either, but it relates directly to §§ 11 and 12 of the 1933 Act, which are expressly controlled by the one-year, inquiry notice statute of limitations at § 13 of the 1933 Act, 15 U.S.C. § 77m. Therefore, the Court adopts the one-year, inquiry notice limitations period for Count VI of the SAC.

At all times relevant to the disposition of this motion, Marietta was a publicly-owned corporation. The business of Marietta included the design, manufacture and distribution of guest amenity items for the travel and lodging industry. Marietta's stock was registered with the Securities Exchange Commission (SEC) and was traded on the National Association of Securities Dealers Exchange (NASDAQ), a national exchange regulated by the SEC.

American Soap Company (American Soap) was, until March 17, 1989, a close corporation. Marietta acquired American Soap on March 17, 1989, and thereafter operated it as a wholly-owned subsidiary under the name, Marietta American.

Pursuant to 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 13 and 1, respectively, Marietta was required to file quarterly (10–Q) and annual (10–K) reports with the SEC. One purpose in requiring public companies to file these reports is to provide the public with true information on the financial condition of the companies listed on public exchanges. 15 U.S.C. § 2 (1934). Marietta's president and treasurer signed all submissions to the SEC. Marietta's fiscal year began on October 1 and ended on September 30 of a given calendar year.

At all times relevant to the disposition of this motion, John S. Nadolski was the president, chief executive officer, and a director of Marietta. Until the termination of his employment on or about July 22, 1991, Thomas Blair was the treasurer and a director of Marietta. Blair has admitted to embezzling more than $400,000.00 from Marietta and pleaded guilty in the Northern District of New York (Case No. 92–CR–246) to illegally moving more than $5,000.00 in interstate commerce (18 U.S.C. § 2314) and conspiring to commit perjury (18 U.S.C. § 371).

Nadolski, while acting as the president, chief executive officer, and a director of Marietta, did:

1. unlawfully, knowingly and wilfully make and cause to be made false and misleading statements as to material facts in the quarterly report on Form 10–Q for Marietta, for the first quarter of the fiscal year ended September 30, 1989, said quarter covering the months of October, November and December, 1988, which was filed with the SEC on or about February 14, 1989, in violation of 15 U.S.C. §§ 78m(a) and 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.13a–13;

2. unlawfully, knowingly and wilfully make and cause to be made false and misleading statements as to material facts in the annual report on Form 10–K for Marietta, for the fiscal year ended September 30, 1989, which was filed with the SEC on or about December 28, 1989, in violation of 15 U.S.C. §§ 78m(a) and 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.13a–1;

3. unlawfully, knowingly and wilfully, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly, on or about and between February 14, 1989 and November 6, 1989, use and employ manipulative and deceptive

---

**3.** 15 U.S.C. § 78r(c).

**4.** 15 U.S.C. § 78r(a).

devices and contrivances in connection with the purchase and sale of securities, that is, the stock of Marietta, and (a) employ a device, scheme and artifice to defraud, and (b) make untrue statements of material facts and omit to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit upon Tucker Anthony Corporation and the public, in connection with the purchase and sale of Marietta stock, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.10b–5; and,

4. unlawfully, knowingly and wilfully falsify, conceal and cover up by trick, scheme and device a material fact, and make false, fictitious and fraudulent statements and representations, and make use of a false writing and document to contain a false, fictitious and fraudulent statement and entry, to-wit: the overstatement as to sales reported in the quarterly report on Form 10–Q for Marietta, for the first quarter of the fiscal year ended September 30, 1989, said quarter covering the months of October, November and December, 1988, and said report filed with the SEC on or about February 14, 1989, in violation of 18 U.S.C. §§ 2 and 1001.

Nadolski has been tried and convicted in the United States District Court for the Northern District of New York on the above four violations of securities laws. In the same proceeding, Nadolski was tried and acquitted of one count of conspiracy to commit securities fraud in violation of 18 U.S.C. §§ 371 and 1001, and of one count of securities fraud in violation of 18 U.S.C. §§ 2 and 1001.

Donald Rowe was, at all times leading up to the acquisition of American Soap by Marietta, the majority shareholder, chief operating officer and president of American Soap. During 1987 and 1988, negotiations took place between Marietta and Rowe for the acquisition of American Soap.

On or about March 17, 1989, Marietta and Rowe entered into a stock and asset purchase agreement (Purchase Agreement), whereby Rowe received $5,173,000.00 in cash, 350,100 shares of Marietta common stock, a $2,700,000.00 in Convertible Subordinated Notes payable in three (3) equal installments due in 1997, 1998 and 1999, or convertible into 180,000 shares of Marietta common stock after March 10, 1990, an employment agreement with Marietta, and a five (5) year earn out agreement based on Marietta American's net earnings before interest and taxes (EBIT) in the non-core sale of glycerine, a by-product of the saponification process, and based on Marietta American's earnings and on all soap sales of Marietta and of Marietta American.

The earn out agreement had two components: (1) the Glycerine Credit and (2) the Soap Earn Out. Under the Glycerine Credit, Rowe was entitled to a specific percentage of revenue from Marietta's sale of glycerine, to the extent that revenue [5] exceeded a pre-set threshold. In the Soap Earn Out, Rowe was entitled to a specific percentage of Marietta American's EBIT's [6] from soap sales, over certain pre-set levels. Shortfalls under the Soap Earn Out would be carried over and added to the threshold for the next year. Revenues, costs, or expenses included in calculating Glycerine Credits were not to be factored into the calculation of EBIT's, and *vice versa*.

The Purchase Agreement provided that independent accountants would prepare and deliver to Rowe and Marietta a statement

---

5. Net of discounts, allowances, returns, sales taxes, freight and all other expenses incurred by Marietta directly in connection with the sale of glycerine and the purification, refining and preparation of glycerine for sale, including, costs and expenses incurred after the saponification process has resulted in the production of treated spent lye; provided, however, that only depreciation of equipment used to purify, refine and prepare the glycerine for sale and for packing and shipping the glycerine shall be deducted in calculating the Glycerine Credit. Stock and Asset Purchase Agreement § 1.06.

6. Less all costs, expenses or other deductions incurred in connection with the "soap business", whether reflected in the books of Marietta or its customers. Stock and Asset Purchase Agreement § 1.06.

setting forth calculations of the two components of the earn out agreement, within 120 days of the end of the fiscal year. Paragraph 1.06(e) of the Purchase Agreement allowed Rowe to contest the accountants' calculations as set forth, in pertinent part, below:

> At any time within three months after the furnishing of any such balance sheet or statement of income or loss to [Rowe], [Rowe] may elect to question the accuracy of the statement by notifying [Marietta] to such effect. [Rowe] shall then have the right to employ [at Rowe's expense] one firm of certified public accountants to examine the records and accounts of [Marietta American] in order to check the accuracy of the questioned statements. Any statement not questioned by [Rowe] by notice during the said three month period shall be final and conclusive upon [Rowe] and shall constitute a final and conclusive account stated.

After the acquisition, Marietta conducted a public offering of its stocks and netted approximately $22,287,000.00. Nadolski, who sold approximately one-quarter of his Marietta holdings in the same public offering, netted a gain of $1,906,000.00, and Blair sold 9,000 shares, for a profit of $171,540.00. In the two years between the beginning of the first quarter of fiscal 1989 and the end of the third quarter of fiscal 1990, Marietta common stock on the NASDAQ rose in value from a low of $10¾ per share to a high of $26¼ per share. On August 15, 1990, Marietta issued a press release stating of the third quarter of fiscal 1990 that Marietta had experienced a 22% growth in sales and a 31% increase in net income. The August 15 release predicted continued growth and profitability for fiscal 1990 and beyond. By the close of fiscal 1990, however, Marietta stock had fallen below the $10 mark.

On November 12, 1990, Marietta reported on the PR Newswire that it had made a downward adjustment to its earnings estimates for fiscal 1990. On December 27, 1990, Marietta announced financial results for the fourth quarter and fiscal year ended September 30, 1990. From fiscal 1989, net income fell approximately $383,000, or 13%, and earnings per share declined $0.58. Fourth quarter losses were approximately $1,480,000, and fourth quarter earnings per share declined $0.51.

On October 31, 1991, Marietta issued a press release which revealed that Marietta had "discovered possible defalcations of Company funds by a former financial officer aggregating at least $385,000 and of possible misstatements in the Company's financial statements for its 1988 and 1989 fiscal years." On December 19, 1991, Marietta issued another release to the effect that preliminary audits conducted in the wake of the embezzlement announcement revealed irregularities in financial statements for fiscal years 1987–1990, significant overstatements on reported earnings for the fiscal years 1988 and 1989, and that Marietta's outside auditor had withdrawn its opinions for fiscal years 1988–1990.

Between March 17, 1989 and May 12, 1992, Rowe acquired and sold Marietta stock. During approximately the same time span, Rowe served as a director, officer, and consultant of Marietta. On March 3, 1992, Rowe, Nadolski and Marietta entered into a written agreement tolling unexpired statute of limitations defenses with respect to any causes of action which Rowe might have against Marietta and Nadolski. On November 24, 1992, Rowe brought suit in this district.

■ The date of the tolling agreement, March 3, 1992, suggests that Rowe will defeat Marietta's motion if he was not put on notice before March 3, 1991. Marietta asserts that Rowe was on constructive notice of the alleged fraud as early as September of 1990, presumably from the time Marietta stock began to suffer a serious decline in price on an open exchange. Marietta quotes from a deposition of Rowe wherein the deponent says that, by early September of 1990, he knew that something was drastically wrong with the company. Rowe Dep. at 813.

Failing that, Marietta posits that Rowe must have been on notice by December 27, 1990, when Marietta announced a 13% decline in net income only 5½ months after releasing news of a 31% growth in net in-

come in the third quarter and publicly predicting "continued growth and profitability for fiscal 1990 and beyond." Under a third tack, Marietta alleges that Rowe's admitted knowledge, as of March of 1990, of misrepresentations made by Nadolski prior to consummation of the Purchase Agreement, constitutes constructive notice. Marietta also asserts that Rowe's impression, as of the early summer of 1989, that he was being deprived of relevant information of Marietta's operating activities, vis-à-vis his directorship, and that he was being forced out of his contractually-provided role as an officer of Marietta, give rise to a finding of constructive notice well before March 3, 1991.

Marietta's assertions are, in a nutshell, that Rowe had sufficient "storm warnings" to constitute constructive notice of the possibility of fraud. *See Harner v. Prudential–Bache*, 35 F.3d 565 (Table), 1994 WL 494871 (6th Cir.1994) (*Harner II*). Moreover, the corporate defendant posits that Rowe, as a director, had both the opportunity and the obligation to investigate the corporate defendant's books with due diligence.

Rowe counters that the circumstances of this case render Marietta's limitations defense improper for summary determination. According to Rowe, the foundation of its securities fraud claims is, principally, fraud in the falsification of Marietta's financial statements for fiscal years 1987, 1988 and 1989. Rowe asserts that the fact that Marietta's governing board, which had other directors than Rowe, Nadolski and Blair—directors who were presumably neither interested parties in the acquisition of American Soap nor in conspiracy with Nadolski and Blair—did not publicly disclose news of possible misrepresentations in the subject financial statements until October 31, 1991. Rowe correctly posits that Marietta and its directors had a legal duty to promptly reveal the fraudulent misstatements in the company's financials when they first became aware of the fraudulent misstatements. N.Y. Bus. Corp. Law §§ 516, 520, 624, 717(a) and 719; 15 U.S.C. §§ 77k(b)(2), 77w and 77x; 17 C.F.R. §§ 229.10, *et seq.*; 15 U.S.C. §§ 78j(b), 78t(c), and 78ff; 17 C.F.R. §§ 240.0–1, *et*

*seq.* Rowe asserts that this is *prima facie* evidence tending to militate against a finding that Rowe could somehow be charged with constructive awareness of the fraud eight months before the corporation and its unindicted directors. Furthermore, Rowe posits that Marietta's use of his deposition testimony ("I knew something was drastically wrong with the company") to establish constructive knowledge as early as September of 1990 is misleading, because in the very next sentence, the deponent says, "But at the time of course I didn't know what." Rowe Dep. at 813.

With respect to Marietta's defense of limitations, the Sixth Circuit held in *Herm v. Stafford*, 663 F.2d 669 (6th Cir.1981), that "a court may properly determine the commencement date for a statute of limitations on summary judgment in the context of a securities case." *Id.* at 682. Under *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), "state of mind" issues such as are necessary to prove ordinary fraud predicating a § 10(b) claim are, in the proper case, appropriate for summary judgment determination. *Id.* at 1479. The *Herm* court elaborated by mandating that "[t]he facts upon which the district court may rely must be sufficient to enable the court to conclude as a matter of law that a reasonably diligent person should have discovered the participation of the particular defendant by the date the fraud should have been discovered." 663 F.2d at 682. The *Herm* court admonished, however, that "[w]hether this standard has been met ... depends on the circumstances in each case." *Id.* The Court has already determined that all three of the contested claims (Counts I, V & VI of the SAC) are governed by a one-year, inquiry notice limitations period.

A court must apply federal law to determine the date on which a statute of limitations in a federal securities case begins to run. *Freeman v. Laventhol & Horwath*, 34 F.3d 333, 341 (6th Cir.1994) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946)); *Herm*, 663 F.2d at 682. As *Herm* instructs, "[t]he Sixth Circuit requires an investor to exercise reasonable care in discovering the alleged fraud." 663

F.2d at 682. Under this "reasonable care" or "reasonable diligence" standard, the plaintiff is assumed to be reasonably intelligent. *Id.; Gaudin v. KDI Corp.,* 576 F.2d 708, 713 (6th Cir.1978). In *Harner v. Prudential Sec., Inc.,* 785 F.Supp. 626 (E.D.Mich.1992) (*Harner I* ), *aff'd,* 35 F.3d 565 (6th Cir.1994) (Table), the court eloquently opined of the "reasonable investor" standard:

> The sophisticated stock broker and the uninitiated rube will both be judged by the same standard, i.e. the "reasonable investor" standard.

*Id.* at 634.

The corporate defendant has attempted to point out the lack of genuine factual contention concerning when Rowe received constructive notice of the alleged fraud, but the Court finds that genuine issues of material fact exist in this inquiry, precluding judgment as a matter of law. FED.R.CIV.P. 56; *Herm,* 663 F.2d at 682.

■ In part two of its motion *in limine,* Marietta asserts that Rowe should be estopped from challenging the statements calculated pursuant to the earn out agreement because he did not challenge them in accordance with the terms of the Purchase Agreement. Rowe opposes the motion with the theory that a party fraudulently induced to enter a contract may treat the contract as voidable. *Media Gen., Inc. v. Tanner,* 625 F.Supp. 237 (W.D.Tenn.1985); *Home Guar. Ins. Corp. v. Third Fin. Servs., Inc.,* 694 F.Supp. 438 (M.D.Tenn.1988). Rowe asserts that contract clause are ineffective to limit liability when there has been fraud or misrepresentation surrounding the contract. *Agristor Leasing v. A.O. Smith Harvestore Prods., Inc.,* 869 F.2d 264 (6th Cir.1989).

The Court finds that Marietta has not met its burden of showing the nonexistence of genuine issues of material fact. In this matter, the Court cannot grant Marietta's motion without finding the contract valid, and the

validity of the contract and the possible existence of fraud vitiating the contract are contested issues of fact. Thus, summary judgment is inappropriate.

For the foregoing reasons, after careful inspection of the issues, record and applicable law, the Court **DENIES** Marietta's motion *in limine.*

### MOTION FOR JUDGMENT ON THE PLEADINGS

■ A party may move for a judgment on the pleadings after the pleadings are closed and within such time as not to delay the trial. FED.R.CIV.P. 12(c). For the purposes of the motion for judgment on the pleadings, all well-pleaded allegations of the nonmoving party's pleadings must be taken as true. *United States v. Moriarty,* 8 F.3d 329, 332 (6th Cir.1993). A court will grant judgment on the pleadings when no material issues of fact exist and the moving party is entitled to judgment as a matter of law. *Id.*

If matters outside the pleadings are considered in adjudicating the motion, the motion should be treated as one for summary judgment pursuant to Federal Rule of Civil Procedure 56. FED.R.CIV.P. 12(c). In determining this motion, the Court looks only to well-pleaded allegations, and to law and accepted commentary thereon. Conversion of this motion is not warranted under Federal Rule of Civil Procedure 12(c).

Marietta moves for judgment on Count IX of the SAC.[7] Count IX of the SAC arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1970). RICO formed Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922. Section 1964(c) of RICO gives individuals a private right of action with recourse to treble damages and a reasonable attorney's fee. 18 U.S.C. § 1964(c).

---

7. Marietta also moves for judgment on the pleadings on Count III of the SAC on the grounds that Rowe's claims under 15 U.S.C. § 77l(2) (§ 12(2) of the Securities Act of 1933) do not survive the outcome of *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Rowe does not contest Marietta on this point. Under

*Gustafson,* sellers of securities in the aftermarket or through private placement offerings are not subject to liability under § 12(2). 115 S.Ct. at 1073–74. Therefore, the Court **GRANTS** Marietta's motion for judgment on the pleadings on Count III of the SAC.

Marietta asserts that RICO is unavailable to Rowe, following the enactment of § 107 of Title I of the Private Securities Litigation Reform Act of 1995 (Reform Act), Pub.L. No. 104–67, 109 Stat. 737 (December 22, 1995), which, *inter alia,* amends 18 U.S.C. § 1964(c) to eliminate as a violation of RICO any conduct actionable as fraud in the purchase or sale of securities.[8] Formerly, Congress prescribed that conduct actionable as fraud in the purchase or sale of securities under either the 1933 Act or the 1934 Act were predicates to RICO actions. As amended by § 107 of the Reform Act, current § 1964(c) reads as follows:

Any person injured in his business or property by reason of a violation of section 1962 of this Chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may entirely rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.*

18 U.S.C. § 1964(c) (the 1995 amendment effected by § 107 of the Reform Act is underlined).

Clearly, Congress intended § 107 to remove as a predicate to RICO conduct that would otherwise be actionable as fraud in the purchase or sale of securities. Any claims brought henceforth under RICO and predicated solely on conduct that would otherwise be actionable as fraud in the purchase or sale of securities would be outside of the district court's jurisdiction. The problem here is that Rowe's civil RICO claim anteceded the enactment of the Reform Act and were pend-

ing at the time § 1964(c) was amended. Marietta's motion for judgment on the pleadings, founded on the application of the amended § 1964(c) to Rowe's pending civil RICO claim, causes the Court to conduct a retroactivity analysis.

The problem of retroactivity arises from the failure of the Reform Act's drafters to expressly prescribe the temporal reach of § 107. In § 108 of the Reform Act, Congress specifically stated that the changes promulgated by the Reform Act "shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, commenced before or pending on the date of the enactment of this Act." However, § 108 is notably silent as to the applicability of the Reform Act to private actions brought under RICO and commenced before or pending on December 22, 1995.

Before reaching the retroactivity issue, the Court addresses first whether Rowe's RICO claims are predicated upon "conduct that would have been actionable as fraud in the purchase or sale of securities," and, accordingly, whether even if the amendment [Reform Act § 107] were applied retroactively, Rowe's complaint would be affected. *District 65 Retirement Trust for Members of Bureau of Wholesale Sales Representatives v. Prudential Sec., Inc.,* 925 F.Supp. 1551, 1567 (N.D.Ga.1996). The legislative history of the Reform Act indicates that Congress intended this language to preclude other offenses such as mail fraud or wire fraud as permissible predicate acts of racketeering "if such offenses are based in conduct that would have been actionable as securities fraud." *Baker v. Pfeifer,* 940 F.Supp. 1168, 1175, note 7 (S.D.Ohio 1996) (*quoting* H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. at 43 (1995, U.S.Code Cong. & Admin.News 1995, at pp. 679, 721, 722)). In the SAC, Rowe alleges mail and wire fraud related to the falsification of certain invoices by employees of Marietta and HiBar Corporation,

---

8. Marietta alternatively moves for judgment on the pleadings on Count IX of the SAC on the grounds that Rowe has failed adequately to plead a violation of any RICO cause of action. Because it is necessary that the Court first examine its jurisdiction in the matter, *see Landgraf v. USI*

*Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), in light of the recent amendment to 18 U.S.C. § 1964(c), the Court reserves analysis of Marietta's alternative grounds for judgment on the pleadings.

a Canadian machine company, related to the overstatement of Marietta assets balance. In the case *sub judice,* Rowe pleads only predicate acts of securities fraud and misrepresentation, and mail and wire fraud solely as means of effectuating the underlying securities fraud. SAC ¶¶ 105–123. Clearly, the conduct alleged by Rowe fits squarely within the description in amended § 1964(c). Therefore, the Court proceeds to an analysis of the retroactivity issue.

The determination concerning whether to apply a statutory amendment or repeal retroactively is "a matter on which judges have 'sound ... instincts' and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 270, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994) (quoting *Danforth v. Groton Water Co.,* 178 Mass. 472, 59 N.E. 1033, 1034 (1901) (Holmes, J.)). It is axiomatic that federal courts traditionally have adhered to a presumption against statutory retroactivity, primarily in order to avoid unfairness to the party relying on the pre-amended legislation. *E.g., General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992) ("Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations upon settled transactions.").

In *Landgraf,* 511 U.S. 244, 114 S.Ct. 1483, the Supreme Court explained its history of applying the presumption against statutory retroactivity to cases pending at the time of enactment or repeal of a statute:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new

statute would have a retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280, 114 S.Ct. at 1505.

The *Landgraf* Court, however, noted an exception to the presumption against statutory retroactivity, to-wit, where the legislative action amended a jurisdictional statute:

> Although we have long embraced a presumption against statutory retroactivity, for just as long as we have recognized that, in many situations, a court should apply the law in effect at the time it renders the decision ... [and] have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed.

*Id.* at 273, 114 S.Ct. at 1501.

By way of explanation for this exception to the presumption against statutory retroactivity, the Supreme Court iterated:

> Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." [9] Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties." [10]

*Id.* at 274, 114 S.Ct. at 1501–1502.

Some commentators assert that the 1995 amendment to § 1964(c) fits within the exception to the presumption against statutory retroactivity. *See, e.g.,* Gary G. Lynch and Thomas P. Ogden, "The Private Securities Litigation Reform Act of 1995: Civil RICO Reform," in *Sweeping Reform: Litigating and Bespeaking Caution Under the New Securities Law,* 923 PLI/CORP. 623, 641 (1996)

**9.** Quoting *Hallowell v. Commons,* 239 U.S. 506, 508, 36 S.Ct. 202, 203, 60 L.Ed. 409 (1916).

**10.** Quoting *Republic Nat'l Bank of Miami v. United States,* 506 U.S. 80, 98–100, 113 S.Ct. 554, 565, 121 L.Ed.2d 474 (1992) (Thomas, J., concurring).

(hereinafter, Lynch and Ogden, *Civil RICO Reform* ) ("Longstanding principles of statutory construction suggest that the [Reform] Act has cut off pending civil RICO claims based on allegations of securities fraud.") (citing *Bruner v. United States,* 343 U.S. 112, 72 S.Ct. 581, 96 L.Ed. 786 (1952)). The Supreme Court has not yet spoken directly to the issue, and nor have any of the circuits, although the Court has found several federal district court opinions holding against application to cases pending on December 22, 1995, of amended § 1964(c). *See, e.g., District 65 Retirement Trust,* 925 F.Supp. 1551, *supra; Baker,* 940 F.Supp. 1168, *supra; Klein v. Boyd,* 1996 WL 675554. (E.D.Pa. Nov. 19, 1996); *In re Prudential Sec. Inc. Lim. Partnerships Litig.,* 930 F.Supp. 68 (S.D.N.Y.1996); *Mathews v. Kidder, Peabody & Co., Inc.,* 947 F.Supp. 180 (W.D.Pa.1996). At least one federal district court has ruled in favor of application of amended § 1964(c) to dismiss a pending RICO claim. *Reading Wireless Cable Television Partnership v. Steingold,* 1996 WL 741432 (D.Nev. July 30, 1996).

Of the cases finding against retrospective application, all share one common characteristic pertinent to the disposition of the instant case—the plaintiffs in all five cases were barred from bringing § 10(b) actions by the limitations period adopted in *Lampf,* 501 U.S. 350, 111 S.Ct. 2773. *District 65 Retirement Trust,* 925 F.Supp. at 1570; *Baker,* 940 F.Supp. at 1179; *Klein,* 1996 WL 675554, at *29; *In re Prudential,* 930 F.Supp. at 79; *Mathews,* 947 F.Supp. at 185–186.

*District 65 Retirement Trust* was decided on the impairment of the plaintiffs' ability to recover for alleged misdeeds otherwise actionable as securities fraud. *District 65 Retirement Trust,* 925 F.Supp. at 1570. Because the plaintiffs let the statute of limitations for securities fraud run prior to filing their securities fraud claims under the 1934

Act, their only recourse was RICO, which has a longer statute of limitations than that provided under *Lampf, supra. Id.* The court determined under a *Landgraf* analysis [11] that § 1964(c) as amended by § 107 of the Reform Act would operate retroactively if applied to dismiss the plaintiffs' RICO claims. *Id. Landgraf*'s prohibition against retrospective application of a statute absent "clear congressional intent favoring such a result" [12] led the court to conclude that the plaintiffs' RICO claims were not barred by § 1964(c). *Id.* In *Baker,* the court determined that application of amended § 1964(c) would operate retroactively. *Baker,* 940 F.Supp. at 1179. Because the statute of limitations under *Lampf* precluded plaintiffs' maintaining a § 10(b) suit, RICO was the plaintiffs' only available federal avenue left open to redress the defendants' alleged frauds. *Id.* The *Baker* court, citing to *District 65 Retirement Trust* for support, held that this potential impairment constituted retroactive operation pursuant to *Landgraf. Id.*

*Klein* and *In re Prudential* share with *Baker* and *District 65 Retirement Trust* this common thread of time-barred § 10(b) claims. 1996 WL 675554, at *29, and 930 F.Supp. at 79, respectively. In *Mathews* the plaintiffs sought class certification of a class offended by alleged violations of 18 U.S.C. § 1964(a), (b) and (d), but no other federal statutes. *Mathews,* 947 F.Supp. at 180–182. The *Mathews* court held that to deprive plaintiffs of their RICO claims by application of amended § 1964(c) constituted impairment under the second prong of the *Landgraf* retroactivity analysis, *supra* at note 4. *Mathews,* 947 F.Supp. at 185–186.

The Court discerns one major difference between *District 65 Retirement Trust, Baker, Klein, In re Prudential,* and *Mathews*—where impairment was found in the elimination of the plaintiffs federal causes of action

---

**11.** *Landgraf* instructs courts to determine whether the new statute would have a retroactive effect, i.e., whether it would impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.
*Landgraf* then instructs courts that

if the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.
511 U.S. at 280, 114 S.Ct. at 1505.

**12.** *Ibid.*

in their entireties—and the matter *sub judice*. Rowe timely filed his federal securities fraud claims. Before the Court, then, is the query—would application of amended § 1964 to Rowe's civil RICO action impair rights he possessed when he acted? In answer to this question, *Reading Wireless* is an invaluable guide.

In *Reading Wireless*, the plaintiffs' § 10(b) claims were still extant at the time the court decided the defendant's motion to dismiss the complaint's RICO counts. 1996 WL 728045, at *3. The court began its analysis as this Court has—by looking to the Reform Act to determine whether Congress had expressly prescribed § 107's temporal reach. *Id.* at *2. Finding no clear expression, the *Reading Wireless* court examined the effect of retrospective application on the plaintiffs under the *Landgraf*[13] analysis, i.e., whether the retrospective application would impair the rights of the plaintiffs. The court looked to the nature of § 107 for its answer:

> The nature of the amendment made by § 107 does not bring it within the class of enactments as to which the presumption against retroactivity arises. As has been seen, the amendment was to remove what Congress considered an unnecessary and unfair provision for damages. This, taken together with the implication given by the omission from § 108's specific temporal reach language of any mention of the RICO amendment, calls for retrospective application of [§ 107] as to plaintiffs' RICO claims.

*Id.* at *3. The court relied partly on comments made by Arthur Levitt during hearings on Reform Act before the Telecommunications and Finance Subcommittee of the House Commerce Committee:

> Because the securities laws generally provide adequate remedies for those injured by securities fraud, it is both unnecessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO.

Testimony of Hon. Arthur Levitt, Chairman of the Securities Exchange Commission, Hearings on H.R. 10, the Common Sense Legal Reform Act of 1995, before the Telecommunications and Finance Subcommittee of the House Commerce Committee, February 10, 1995, *reprinted in* 1996 U.S.C.C.A.N. 679, 746.

Building upon this weighty pronouncement by SEC Chairman Levitt, the court concluded that "retroactive application would not deprive plaintiffs of legitimate expectations or impact settled transactions." *Reading Wireless*, 1996 WL 728045, at *2 (citing *General Motors Corp. v. Romein*, 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992)). The *Reading Wireless* court further opined that its application of amended § 1964(c) "in no way [ran] counter to the underpinnings of the usual presumption against retrospectivety [sic] described by Justice Stevens in *Landgraf.*" *Id.* (citation omitted).

This Court agrees with the reasoning of *Reading Wireless*—that retroactivity to correct a mistake is often entirely benign and legitimate. *Id.* (citing *Landgraf*, 511 U.S. at 266–268, 114 S.Ct. at 1498). Congress enacted RICO to combat the infiltration and corrupt operation, by organized crime, of legitimate businesses affecting interstate commerce. *Iannelli v. United States*, 420 U.S. 770, 787, note 19, 95 S.Ct. 1284, 1294, note 19, 43 L.Ed.2d 616 (1975); *United States v. Sutton*, 605 F.2d 260, 263 (6th Cir.1979), *vacated on other grounds*, 642 F.2d 1001, *on rehearing*, 642 F.2d 1001 (1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 995 (1981). As early as 1985, the Supreme Court recognized that RICO was being used primarily in ways not expressly intended by Congress. *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 499, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). The *Sedima* Court, nonetheless, recognized that "correction must lie with Congress," *id.*, 473 U.S. at 499, 105 S.Ct. at 3287, and allowed the plaintiffs' RICO claims. However, the dissent of four Justices[14] in an opinion filed separately ad-

**13.** *Supra* note 11.

**14.** *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985) (Justice Marshall, with whom Justice Brennan, Justice Blackmun and Justice Powell join, dissenting).

monished that RICO "virtually eliminates decades of legislative and judicial development of private civil remedies under the federal securities laws." *Sedima,* 473 U.S. 479, 505, 105 S.Ct. 3292, 3294. Representative Cox of California, who sponsored § 107, cited both the majority and dissent in *Sedima* to support the proposition that Congress intended RICO as a weapon against organized crime, not as a weapon against ordinary investors and the business community. James Hamilton, "Private Securities Litigation Reform Act of 1995" in *Derivatives 1996: Avoiding the risk and Managing the Litigation,* 932 PLI/Corp. 475, 574 (1996). In the debate, Representative Fields of Texas agreed with Representative Cox, stating that Congress did not intend RICO to be a supplement to the federal securities laws. *Id.* at 582.

Congress has spoken in its enactment of the Reform Act. The fact that Congress provided no express temporal reach for the application of § 107 to RICO, although expressly providing that Title I of the Reform Act would not operate retroactively against the 1933 and 1934 Acts, leads the Court to conclude that Congress knew it was amending a jurisdictional statute [15] and correcting a mistake, and that Congress intended the regular judicial rules of construction to apply to this amendment.[16]

The Court finds that application of amended § 1964(c) to Rowe's civil RICO action would not impair Rowe's rights by retroactively stripping him of his only recourse for recovery under a federal securities fraud theory. *Cf. District 65 Retirement Trust,* 925 F.Supp. at 1570; *Baker,* 940 F.Supp. at 1179; *Klein,* 1996 WL 675554, at *29; *In re Prudential,* 930 F.Supp. at 79; *Mathews,* 947 F.Supp. at 185–186. The Court finds that retrospective application does not impair Rowe's legitimate expectations. *Reading Wireless,* 1996 WL 728045, at *2 (citing *Gen-*

*eral Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992)). Nor would application increase any party's liability for past conduct or impose new duties with respect to transactions already completed. Application of amended § 1964(c) would, on the other hand, accomplish the intent Congress manifested in § 107 of the Reform Act—to curb the use of civil RICO by private parties for conduct otherwise actionable as securities fraud.

The pleadings of Rowe, taken in their entirety as true, show predicate acts solely actionable as securities fraud under the 1933 and 1934 Acts. Moreover, the pleadings do not show that Marietta fits under the exception for parties defendant convicted of criminal fraud in the purchase or sale of securities. Retrospective application does not impair Rowe's rights seek recovery under the federal securities laws, nor would it increase liability or impose new duties. The Court finds that retrospective application of amended § 1964(c) to Rowe's pending RICO action does not violate the presumption against retroactivity voiced in *Landgraf,* 511 U.S. 244, 114 S.Ct. 1483. For these reasons, the Court **GRANTS** Marietta's motion for judgment on the pleadings and hereby **DISMISSES** Count IX (RICO Count) of the SAC.

## CONCLUSION·

For the foregoing reasons, the Court **DENIES** Marietta's motion *in limine* and **GRANTS** Marietta's motion for judgment on the pleadings. In light of the recent amendment to 18 U.S.C. § 1964(c), effected by Congress' December 22, 1995 enactment of the Reform Act, Count IX of the SAC is hereby dismissed for lack of subject matter jurisdiction. Count III of the SAC is hereby dismissed in light of the Supreme Court's recent holding in *Gustafson v. Alloyd Co.,* 513 U.S.

---

**15.** Section 1964(c) is a permissive grant of federal jurisdiction. *Tafflin v. Levitt,* 493 U.S. 455, 460, 110 S.Ct. 792, 795–796, 107 L.Ed.2d 887 (1990); *Chivas Prods. Ltd. v. Owen,* 864 F.2d 1280, 1284 (6th Cir.1988) ("§ 1964(c), which parallels § 4 of the Clayton Act, is, after all, private civil RICO's jurisdictional statute"); *see also* Lynch and Ogden, *Civil RICO Reform,* 923

PLI/Corp. 623; *but see Klein,* 1996 WL 675554 at *30 (because RICO § 1964 does not exclusively apply to actions brought in federal district court, Reform Act § 107 cannot be said to be strictly a change to a jurisdictional statute).

**16.** *Inclusio unius est exclusio alterius.*

849

561, ——–——, 115 S.Ct. 1061, 1073–1074, 131 L.Ed.2d 1 (1995).

**IT IS SO ORDERED.**